[Crim. No. 5416. In Bank. Aug. 14, 1953.]

THE PEOPLE, Respondent, v. WILLIAM FRANCIS RUPP, Appellant.

N. D. Meyer, Public Defender, for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James L. Davis, District Attorney (Orange) and James P. Devine, Assistant District Attorney, for Respondent.

EDMONDS, J.—A jury found William Rupp guilty of murder in the first degree, without recommendation, and concluded that he was sane at the time the crime was committed. His motion for a new trial was denied and the statutory appeal (Pen. Code, § 1239(b)) is from the judgment which imposes the death penalty.

Most of the evidence concerning the commission of the crime is without conflict. For about six months prior to August 8, 1952, the date Ruby Ann Payne was killed, Rupp was employed by William Dyer as an assistant beekeeper and general helper. On the morning of the homicide, Rupp was working in the yard near the Dyer home. Shortly after noon, Dyer and his wife went away, leaving their three young children in the care of Ruby Ann, a 15-year-old girl who lived nearby.

Kenneth Dyer, aged 8, testified that shortly after the parents had gone, Rupp knocked at the rear door of the house and asked him if his father was home. When told that Dyer was

away, Rupp departed. A few minutes later, he returned and explained to Kenneth that he had a check for the boy's father. Kenneth suggested that Rupp give the check to the baby sitter, but Rupp refused. Instead, he entered the house, placed the paper upon a desk in the living room, and left.

A short time later, Kenneth heard someone open the rear door. In the hall outside the playroom in which Ruby Ann and the children were watching a television program, Kenneth encountered Rupp holding a .22 caliber rifle. They discussed the gun for a few moments. The boy then left and returned with a bullet, which he gave to Rupp.

At the request of Rupp, the boy brought a hammer to him. Rupp then sent him upon another errand, this time to a warehouse located some distance from the house, to obtain a five-gallon can.

As he was returning from the warehouse, Kenneth heard the sound of a shot. Hurrying to the house he discovered Rupp with Ruby Ann in the hall outside the bedroom door. The girl was lying upon the floor. Rupp was upon one knee beside her, "pulling at her jeans." When Kenneth asked what had happened, Rupp jumped up but said nothing. After the boy repeated his question, Rupp stood silently for a moment and then ran out the rear door. A few seconds later Kenneth saw Rupp's automobile being driven away.

A neighbor called a physician who arrived about one-half hour later. The girl's clothing was disarranged and there had been a great amount of bleeding. He estimated that death had occurred several minutes before his arrival.

According to the autopsy surgeon's report, the girl was shot twice. One bullet entered the back, passed through the lungs and emerged from the chest. A second bullet penetrated the right side of the face and lodged in the neck. In addition, a wound which could have been caused by a blow from a hammer was found on the top of the head. Death resulted from asphyxiation, caused by blood entering the trachea and bronchea, combined with shock and loss of blood. An examination of the genital system revealed a bruise or abrasion on the hymen, resulting from the insertion of some object into the vagina. No traces of seminal fluid were found about the body, although stains of that substance appeared upon Rupp's underclothing.

One bullet was removed from the body and another was found nearby. Searchers discovered Rupp's automobile in a lemon grove about 5 or 6 miles from the Dyer ranch. In

the car they found a .22 caliber rifle and several hundred rounds of ammunition. A ballistics test indicated that the lethal bullets came from that gun.

Rupp was arrested late in the evening of the fourth day after the killing. He was taken to the city jail and interrogated by police officers. He readily admitted killing the girl and gave a detailed confession to both arresting officers, each of whom testified as to its contents. The next morning, he again confessed. This confession was recorded by a stenographer and a transcription of it read to the jury. A third confession, made two days later, also was read to the jury. In addition, police officials, present when the confessions were given, testified as to their substance. All of this evidence was admitted over the objection of counsel for Rupp.

Substantially, the same facts are stated in each confession. Rupp told the officers he had seen Ruby Ann a few times prior to the day of the homicide but never had occasion to speak to her. While he was working in the yard, he saw the girl go into the house. Referring to the time immediately after the Dyers had left, he said "That is when I got . . . the impulse to go in the house and try to rape her I got it to go right now. I have had the impulse for a long time to do this thing." "To this girl?" he was asked. "No," he replied, "just anyone in particular; just whenever a chance come up, but then it just seemed like a chance there, and I jumped real fast to it without stopping to plan or think anything out."

Rupp stated that he then got his gun from his car, removed his shoes, and went into the house. Asked why he took the gun with him, he replied "I was going to take it in to try to scare her." The questioning then continued as follows: "Q. So she would submit to you? A. Yes. Q. And let you have sexual relations with her there at that time? . . . A. Yes, and I changed my mind to do it; I didn't. Q. What did you decide to do then? A. Knock her out. Q. And what did you do then? A. I got the boy to get me a hammer."

So that the boy would leave, the statement continued, Rupp sent him to the warehouse for an empty can. The other children also left, and he was alone with the girl, who was sitting on a sofa watching the television program. In reply to a question, he told the officers he then hit the girl on the top of the head with the hammer.

Further interrogation brought out these details: "Q. What

did you say to her first? A. Nothing. Q. You didn't say a thing? A. I didn't say a thing. Q. Your purpose at that time was to knock her unconscious? A. Yes. Q. So you could use her, and you knew she wasn't going to submit to you unless you got her unconscious? A. Yes. . . . Q. Then after you hit her with the hammer what did you do? A. Well, I didn't knock her out, and she ran, and as she ran down the hall to stop her I shot, and she kept on running, so I shot a second time and then she fell.''

Rupp stated that thereupon, he ''ripped her clothes off.'' He denied that thereafter he attempted to rape her; instead, ''just then I left; I decided to get up and get out of there.'' However, he admitted fondling the body and inserting his finger into the genital organs. He further stated that the reason that he tore the blouse and Levis partly from the girl's body was to see her naked form. He admitted that if the girl had submitted to him he would not have used force.

After he left the Dyer ranch, Rupp drove to the entrance of a canyon about 5 or 6 miles away. There he stopped at a grocery store and purchased some crackers and soda pop. He remained in the canyon for three days, sleeping in his automobile. Questioned concerning his reason for remaining in the vicinity, he answered that he believed his car would be recognized. On the fourth day, he abandoned his car and hid in a lemon grove. That evening, he walked into a nearby town to get something to eat and to give himself up.

Rupp does not challenge the sufficiency of this evidence to support the judgment of conviction. He contends that the trial court erred in rulings upon the admission of evidence and instructions to the jury. Also, he argues, it was error to try the issue of insanity before the same jury which heard the evidence concerning the commission of the crime. Finally, he claims prejudice from remarks of the trial judge.

It is contended that testimony concerning Rupp's admissions or confessions, insofar as they related to an attempt to commit rape, should not have been received because the corpus delicti of that crime had not been established. In this connection it is argued that the corpus delicti must have been proven ''to a moral certainty and beyond a reasonable doubt.''

However, as stated in *People* v. *Cullen*, 37 Cal.2d 614 [234 P.2d 1]: ''It is the settled rule . . . that the corpus delicti must be established independently of admissions of the defendant. Conviction cannot be had on his extrajudicial ad-

missions or confessions without proof *aliunde* of the corpus delicti; but full proof of the body of the crime, sufficient to convince the jury of its conclusive character, is not necessary before the admissions may be received. A prima facie showing . . . is all that is required. ■ The defendant's extrajudicial statements are then admissible, the order of proof being discretionary, and together with the prima facie showing must satisfy the jury beyond a reasonable doubt." (Pp. 624-625.)

■ In the present case, apart from Rupp's admission, there was evidence of the use of force against the girl, a disarrangement of the clothing and a disturbance of the genital organs. Also, the record includes ample testimony placing Rupp at the scene of the crime. From these facts an attempt to commit rape could be inferred.

No evidence was offered by Rupp which would tend to disprove the commission of the acts stated by him in his confessions. Instead, by data in regard to his personal medical history, he sought to establish the existence of a mental condition which would excuse his acts or justify conviction of a lesser crime than murder in the first degree. Objections to such evidence were sustained.

Several formal offers of proof were made, all of which were substantially similar. They included evidence purporting to show that Rupp had suffered from various illnesses and disorders which might have damaged the tissues of the brain. Abnormal conditions occurring at the time of his birth caused him to be born a "blue baby," a condition indicating oxygen starvation. During his first year, he suffered from Otis Media, mastoiditis, pneumonia, influenza, and anemia. Subsequently, he became afflicted with intestinal tuberculosis, leukemia and rickets. When he was 3 years old, he underwent seven operations for mastoids, with a possible infection or damage to the brain. Between the ages of 3 and 6, he suffered from spastic convulsions at intervals of about two months, at which times he would become unconscious for periods of 10 or 12 hours with fevers of about 106 degrees.

This history included a series of abnormal sexual practices which began shortly after he was 9 years old and continued until the time of the present action. In 1948, at the age of 14, Rupp committed an assault upon a woman. He entered her bedroom while she was asleep, struck her on the head with a hammer, and then fled. Rupp was apprehended and committed to a state mental hospital for observation. There he

was diagnosed as "not psychotic but (having) a prepsychotic personality. Diagnosis Schizoid Personality Without Psychosis (Fetishism)." He was released on probation to the custody of his parents and placed under the care of a psychiatrist.

About eight months later, Rupp was involved in an automobile accident in which he struck two girls. Recounting the incident to an examining psychiatrist, Rupp stated that he drove his automobile onto them intentionally in order to have sexual relations with them, but he became frightened and abandoned his purpose. Officially, the occurrence was reported to have been an accident, and no criminal prosecution followed.

Two encephalographic studies of Rupp were made, one in February, 1949, and another two months after Ruby Ann was killed. They indicated damage to the parts of the brain affecting the thinking, volitional and emotional faculties. A characteristic of this type of injury is to cause "impulsive, irrational behavior," subjecting a person so afflicted to high sensitivity to stimuli, fainting or epileptic seizures. According to the opinion of the medical experts, Rupp's brain was in this condition at the time of the killing.

This evidence, Rupp argues, should have been admitted for these purposes: (1) to aid the jury in assessing the penalty; (2) to assist it in fixing the degree of the murder; (3) as direct evidence of, and as a foundation for opinion testimony concerning, Rupp's mental capacity to premeditate, deliberate, form malice or intent; and (4) to show unconsciousness.

Upon the issue of the extent of punishment, the rejection of this evidence was proper. ■ As stated in *People* v. *Barclay*, 40 Cal.2d 146 [252 P.2d 321], "[w]hen a defendant is convicted of murder in the first degree, the jury determines his punishment as well as his guilt. (Citations.) ■ Since the issues of punishment and guilt are determined at the same time, there is danger that evidence or instructions offered on the former issue may influence the verdict on the latter issue. Accordingly, to avoid prejudice to either the People or the accused by injection of collateral issues into the case, evidence of the good or bad habits and background of the accused is generally held inadmissible (citations), and the consideration of the jury is limited to the facts and circumstances attending the commission of the offense itself." (Pp. 157-158.) ■ Evidence concerning the defendant's mental condi-

tion, when offered solely to persuade the jury to reduce the degree of a crime, is not admissible. (*People* v. *French*, 12 Cal.2d 720, 737 [87 P.2d 1014].) However, evidence bearing upon a specific mental state necessary to the conviction of a crime should be received. (*People* v. *Wells*, 33 Cal.2d 330, 350-351 [202 P.2d 53].) In this connection, Rupp argues that the offered testimony was relevant to show a lack of premeditation, deliberation, malice, and intent necessary to convict him of murder in the first degree. He also contends that it was relevant to a showing that he was unconscious at the time he committed the acts.

 All of the evidence received tended to show a killing in the perpetration of or attempt to perpetrate rape, which, if established, is murder in the first degree. (Pen. Code, § 189; *People* v. *Lindley,* 26 Cal.2d 780, 791 [161 P.2d 227].) Where a killing is shown to have been committed under such circumstance, a finding of premeditation and deliberation is unnecessary. (*People* v. *Valentine*, 28 Cal.2d 121, 131-132 [169 P.2d 1]; *People* v. *Bernard*, 28 Cal.2d 207, 211-212 [169 P.2d 636].)

 "[M]alice is shown by the nature of the attempted crime, and the law fixes upon the offender the intent which makes any killing in the perpetration of or attempt to perpetrate the [felony] . . . murder of the first degree." (*People* v. *Coefield*, 37 Cal.2d 865, 868 [236 P.2d 570]; *People* v. *Witt*, 170 Cal. 104, 107 [148 P. 928]; *People* v. *Milton,* 145 Cal. 169, 170-172 [78 P. 549].) The controlling inquiry is whether Rupp had the mental state essential to the commission of rape or attempted rape.

In *People* v. *Parker,* 74 Cal.App. 540 [241 P. 401], it was said: "The crime of attempt to commit rape upon a girl under the age of consent is compounded of two elements, viz: the intent to have sexual intercourse with her, and a direct act done toward its consummation but falling short of the execution of the ultimate design. The overt act need not be the last proximate act to the consummation of the contemplated rape." (P. 546.)

 Although the offer of proof was stated by counsel for Rupp to be for the purpose of showing his inability to deliberate, premeditate, form malice or intent, there was no indication that a person suffering from the type of brain deterioration shown would be unable to form an intent to commit rape. The offer included the reports of several psychiatrists appointed by the court, each of whom stated that Rupp committed the acts because of his intent to have sexual intercourse

with the girl.\* Each of the psychiatrists testified that Rupp had the ability to intend to commit an act of sexual intercourse with her.

Nor did the offer tend to show that Rupp was unconscious at the time he committed the acts. Although counsel for Rupp offered the evidence for that purpose, he did not indicate that any witness would testify that the damaged condition of Rupp's brain would cause him to act in a state of unconsciousness. On the contrary, the reports of the psychiatrists indicated that Rupp, although under the influence of a compelling sexual urge, was in a sufficient state of awareness to contemplate the acts necessary to satisfy his passion. Under these circumstances, the trial judge correctly ruled that such evidence was not material.

No instruction defining manslaughter or murder in the

---

\*Dr. Musfelt, relating his opinion as to the mental state of Rupp at the time of the killing, reported: ''There in the television room was 15 year old Ruby Ann Payne, his employer's baby sitter. An urge to have sexual intercourse with her was experienced. Patient left house and returned to work in the yard of ranch home. . . . The urge to have intercourse with the baby sitter became stronger. He was aware that he was too shy and bashful to secure realization of his sexual desire for intercourse with her other than by the use of force. Thus he went to his car and secured his .22 caliber rifle. He then went back into his employer's home and walked into the television room. . . . The patient then sent the boy from the room with another excuse, walked up to the side of the girl, and hit her on head with hammer. Patient states it was with the idea of 'knocking her out' with no conscious thought of killing her.''

According to the report of Dr. Marcus, ''[Ruby Ann] acting as a baby sitter was watching the television. [Rupp] went out to the car and went to town to get a sack of material and on his return about noon entered the house with a rifle. As she watched the television, he asked one of the three small children of the family to get him a hammer. He struck the girl in the head intending to have intercourse with her and not to kill her.''

Dr. Day's report states: ''While working outside the bee keeper's home [Rupp] kept thinking about the girl inside which made him become progressively more excited sexually and then he entered the home after he removed a .22 caliber rifle from his car. He states he carried this rifle around with him for target practice. He intended using the rifle merely to scare her into having sexual relations with him. He planned his manner of approaching the girl but an eight year old boy in the home changed his mind. He felt it was better then to use a hammer so he asked the little boy to get a hammer for him deciding to use the hammer to render the girl unconscious and then have sexual relations with her. The young girl sat watching television and he decided to strike her on the head with the hammer. He went up behind her and struck her and then she stood up and ran at which time he took his gun and shot at her in order to stop her from fleeing from him so that he could have sexual relations with her. He did not intend to kill her but rather intended to shoot her in an arm or leg to stop her from running.''

second degree was given. ▮▮▮▮ Instead, the jurors were told: "Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree, for murder which is committed in the perpetration or attempt to perpetrate rape, . . . is murder of the first degree, whether the killing was intentional, or unintentional or accidental." On the facts of the present case, this instruction was proper; for, where the evidence points indisputably to a homicide in the perpetration or attempt to perpetrate one of the felonies enumerated in section 189 of the Penal Code, it is proper for the court to advise the jury that the defendant is either guilty or innocent of murder in the first degree. (*People* v. *Sanford*, 33 Cal.2d 590, 595 [203 P.2d 534]; *People* v. *Lindley, supra*, 26 Cal.2d 780, 791 [116 P.2d 227]; *People* v. *Perkins*, 8 Cal.2d 502, 516 [66 P.2d 631]; *People* v. *Johnson*, 219 Cal. 72, 76-77 [25 P.2d 408].)

▮▮▮▮ Rupp contends that the evidence demonstrates conclusively that the killing did not occur in the attempt to commit a felony. Instead, the argument continues, it shows a killing arising out of an assault with intent to commit rape (Pen. Code, § 220), which is not one of the enumerated felonies. But an assault with intent to commit rape is merely an aggravated form of an attempted rape, the latter differing from the former only in that an assault need not be shown. (*People* v. *Welsh*, 7 Cal.2d 209, 213 [60 P.2d 124].) ▮▮▮▮ "An 'assault' with intent to commit a crime necessarily embraces an 'attempt' to commit said crime but said 'attempt' does not necessarily include an 'assault.'" (*People* v. *Akens*, 25 Cal.App. 373, 374 [143 P.2d 795].)

▮▮▮▮ The evidence in the record reasonably shows the commission of no crime other than a killing in an attempt to perpetrate rape. Rupp's confession, the circumstances surrounding the crime, and even his own offers of proof disclose an attack upon the girl in an effort to satisfy his sexual desires. It was proper to give the instruction.

▮▮▮▮ Another contention is that the trial court erroneously refused certain requested instructions. However, each of these was framed on the theory of either manslaughter or murder in the second degree for which there was no basis in the evidence.

Rupp's objection to trying the issue of insanity before the same jury which heard the evidence concerning the commission

of the crime was overruled. Contending that this ruling was error, Rupp argues that the jury might have been influenced by information received during the four days intervening between the two stages of the proceeding, and by remarks made by the trial judge at the close of the former proceeding, in which he said: "I want to say to you that I feel that your verdict is a good verdict." The ruling was made particularly prejudicial, the argument continues, by the denial of a motion to question the jury on *voir dire*.

Generally, it is within the discretion of the trial court whether the issue of sanity should be tried before the same jury as in the former stage of the proceeding. (Pen. Code § 1026; *People* v. *French, supra,* 12 Cal.2d 720, 765 [87 P.2d 1014].) In *People* v. *Daugherty,* 40 Cal.2d 876 [256 P.2d 911], the trial court commented: "You have discharged that duty conscientiously and, *in my opinion, as the evidence in the case warranted.*" This court said: "It is doubtful that the error, if any, in the court's comment was prejudicial in view of the adequacy of the evidence, his strong admonitions to them, and the casual nature of the remark buried as it was in the common laudatory statement regarding the performance by the jury of its duty and the fact that it was made before the sanity hearing began. When we consider those circumstances together with the power of the court to comment on the credibility of testimony, provided he tells the jury it is exclusive judge of all questions of fact and credibility of the witnesses (Cal. Const., art. VI, § 19), we find no prejudicial error." (P. 892.) It has been held that the right to comment upon the evidence permits a trial judge, in proper cases, to express an opinion even as to the guilt of the defendant. (*People* v. *Ottey,* 5 Cal.2d 714, 728 [56 P.2d 193].) And "[t]he fact that the trial judge's remarks were made before the trial on the insanity issue rather than during its progress, gives rise to no distinction as the trial on the substantive charges and the insanity issue constitute but a single trial." (*People* v. *Busby,* 40 Cal. App.2d 193, 202 [104 P.2d 531].) Nor is it necessary either to reexamine the jurors on their *voir dire* or to readminister the oath to them. (*People* v. *Davis,* 94 Cal.App. 192, 197 [270 P. 715]; *People* v. *Foster,* 3 Cal.App.2d 35, 39 [39 P.2d 271]; *People* v. *Woods,* 19 Cal.App.2d 556, 558 [65 P.2d 940].)

The jurors were fully and correctly instructed that they were the sole and exclusive judges of the effect and value

of evidence and of the credibility of witnesses. The evidence is overwhelmingly to the effect that Rupp was sane. Accordingly, no prejudicial error is indicated.

Objection is made to the introduction of evidence of several photographs alleged to be of an inflammatory nature. However, those most likely to prejudice the jury, the photographs of the girl's body taken at the scene of the crime, were admitted over objection only that a proper foundation had not been laid. The others were received after counsel for Rupp either expressly stated that there was "no objection" or where the objections to them were withdrawn.

The judgment and the order denying a new trial are affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred.

Schauer, J., concurred in the judgment.