[Crim. No. 5010.   Second Dist., Div. Three.   Dec. 21, 1953.]

THE PEOPLE, Respondent, v. GENE FRANK KIMBALL, Appellant.

Gladys Towles Root and Herbert Grossman for Appellant.

Edmund G. Brown, Attorney General, and James D. Loebl, Deputy Attorney General, for Respondent.

WOOD (Parker), J.—Defendant was charged with the crime of rape committed with force and violence.   Trial by jury was waived.   He was adjudged guilty of "Assault with Intent to Commit Rape, a felony, a lesser offense than that charged in the information but necessarily included therein." He was sentenced to imprisonment in the state prison.   He appeals from the order denying his motion for a new trial.

Defendant contends that the court erred in finding him guilty of assault with intent to commit rape.

Vera, the prosecutrix, had known defendant about four months prior to July 13, 1952, the day of the alleged offense. During the first three months they saw each other about every

day and he treated her kindly and gave her a few small gifts. They agreed to be married in September. On June 10, 1952, defendant moved to the Cromwell Hotel. Vera was present when he registered at the hotel, and he told the hotel clerk that he was going to marry Vera, and he asked the clerk if Vera might go upstairs. The permission was granted, and Vera went to his hotel room and helped him unpack his suitcase and trunk. She testified that she did not recall whether or not, thereafter, she went with him on many occasions to his room. About three days after he moved to the hotel, she went alone to his room, got a shirt and jacket, and took them to him. She testified that she did not have a key to his room, but she always told him to tell the clerk that she was coming; and that he told the clerk by telephone that he was sending Vera to his room to get wearing apparel for him. About one month before July 13th while defendant was in her home she refused to go with him, and he picked up a "buggy cart" and slammed it against a window—breaking the glass and the frame of the window. She then told him that she did not want to see him again and that he should pay for the damage to the window.

On said July 13th the defendant, who was working at a parking lot near Seventh and Hill Streets in Los Angeles, requested her to meet him at 2 p. m. at a corner of those streets to make arrangements about fixing the window. She met him there and then they went into a bar and he drank a glass of beer and she drank a "coke." After they left the bar he asked her if $7.00 would pay for fixing the window. She replied that she did not know. He said that it was a hot day and he would like to go to his room and change to lighter clothes, and then they would return and have a lunch. They arrived at his room about 4 p. m. She testified that he changed his shirt four or five times, and when she saw that he would not leave any shirt on, she became suspicious and opened the door, intending to leave, but he jumped at her like a beast, grabbed and twisted her arm, and shoved her onto the bed; they started wrestling and fighting; he struck her mouth with his hand, pulled her hair, slapped, beat, bit, and choked her; she fought him until he overpowered her; he forced her to take off her coat and skirt; he yanked her blouse off and took her pants off; he finally forced his privates into her privates; she was bleeding, and the sheet and her slip were bloody; he pulled her off the bed; when she said she wanted a drink of water, he shoved her face into the wash

bowl; he told her that he would kill her if she told anything; she had never had sexual intercourse before; they were in his room about three hours. She testified further that after they left the hotel they walked to and stopped at several bars; he took her in a taxicab to her home; on the way there he stopped and bought a can of beer; they arrived at her home about 8:30 p. m. and defendant dismissed the taxicab; she made no complaint to anyone while in the bars or on the way home, and she was too frightened to leave defendant; he was watching her all the time; she went into her house; he went to the door, but she would not let him in; then he threw the beer can against the outside wall; he remained at house five or ten minutes; she lent a flashlight to him; she called a taxicab for him; then her brother arrived and she fainted.

Her brother Robert testified that when he arrived the defendant got into a taxicab and left; blood was on her neck, arms, knees, and calves of her legs; she had a swollen nose, swollen cheek, and scratches on her neck and arms. She received medical attention at the receiving hospital.

A police officer testified that he saw Vera on July 13th before she went to the receiving hospital; he could see what appeared to be bruises on both sides of her neck, extending from back of the ear to the front of the throat.

After defendant had testified that he went to Vera's home about 2 a. m. of said July 13th and went to bed with her and stayed at her home until 10:30 a. m., she was recalled by plaintiff for further direct examination. She then testified that defendant came to her house about 3 a. m. of said day and knocked on the door; she told him to leave, but he came in; she served coffee and tried to reason with him about coming there at that time; she would say that he left about 5 a. m. "because he had a habit of leaving when people were getting up."

Defendant testified further that, before he moved to the Cromwell Hotel, he stayed at Vera's house about two months; he moved some of his belonging to her house, such as a television, clock, tool box, and some clothing; during that time he slept with her on her bed many times, and they tried to have intercourse but she claimed she was too small for him; he bought the groceries and gave her five or ten dollars a week; she helped him move to the hotel on June 10th; she went with him to his hotel room many times; she has gone

to his room when he was not there; he made arrangements with the hotel clerk so that she could get the key to his room; about every time they were in the room they would lie on the bed, and he would try to have intercourse with her but she always claimed she was too small for him; when he left her house about 10:30 a. m. on July 13th, she agreed to meet him at a bar next to the parking lot where he was working; after she met him there he drank a beer and she drank a "coke"; he said he wanted to change his clothes; when they arrived at his room he went down the hall and took a shower; when he returned to the room she took her skirt off and lay on the bed; then he lay on the bed; they "tried to have intercourse and the phone rang"; he answered the telephone three times; he did not push her head into the wash bowl; he did not threaten her or say anything about having a gun; he did not tear any of her clothes; they were in the room about three hours; after leaving the hotel they walked to a bar which was about a block away; he ordered a beer for himself and orange juice with Vodka in it for her; then they walked to another bar; up to that time she had not complained that he had hurt her in any way; after she had tried to telephone to her brother, she complained about feeling ill from the drink; he told her that he would send her home in a taxicab; when he hailed a taxicab she looked sick and told him that she did not feel well; he decided to take her home; he went into her house with her; he told her he would wait for her brother (who was coming to the house) and the brother could take him down town; she said that she did not feel well and wanted to go to bed, that he should go home in a taxicab because it would not look right for him to be there when her brother came; and she also said that her brother might be mad on account of the window.

Five witnesses, called by defendant, testified that Vera's general reputation for truthfulness and chastity was bad. A witness, called on rebuttal by the People, testified that her reputation for morality and chastity was good.

Section 1159 of the Penal Code provides that: "The jury, or the judge if a jury trial is waived, may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged, or of an attempt to commit the offense." ▮ Assault with intent to commit rape is an aggravated form of attempted rape. (*People* v. *Rupp*, 41 Cal.2d 371, 382 [260 P.2d 1].) ▮ Such an assault is an offense which is included in the offense of rape. (*People*

v. *Chavez*, 103 Cal. 407, 408 [37 P. 389].) (Under the facts in some cases, however, the court is not required to give an instruction to that effect. See *People* v. *Cardaropali*, 115 Cal.App.2d 235 [251 P.2d 692].) ▮ Appellant argues to the effect that under the facts of this case the judge was required to find the defendant guilty as charged or not guilty of any offense. That argument is based upon appellant's claim that he admitted that he had sexual intercourse with her at the hotel on July 13th. Statements in his brief are calculated to imply that he testified that he accomplished such an act at said place and time. He states in his brief that the testimony of appellant, "in its simplest form," was that he did in fact have an act of intercourse with her but the act was not accomplished by force and violence; that "the testimony on both sides conceded the issue of an act of sexual intercourse on July 13, 1952." Those statements are so qualified that they do not amount to statements that appellant testified that he had sexual intercourse with her at the hotel on July 13th. One of the statements is that his testimony "in its simplest form" was that he did in fact have an act of intercourse with her. The other statement is that *"the testimony* on both sides *conceded* the issue" of an act of sexual intercourse on July 13th. Those statements are conclusions of appellant that the effect of his testimony was that such act was accomplished. Appellant does not state in his brief that he testified that he had sexual intercourse with her at the hotel on July 13th. The record does not show that he so testified. In addition to the testimony of appellant hereinabove stated, to the effect that they tried to have intercourse at her house and at the hotel, appellant was asked if he had sexual intercourse with her at any time during the period that he lived at the hotel, and he replied: "I wouldn't say we had intercourse. We tried to have it." He was then asked: "Well, describe what you mean by that?" and he replied: "Well, I tried to have an intercourse with her but she would always say it hurt her and so I wouldn't complete the act." It thus appears that the word "tried" was emphasized by appellant in his testimony regarding the alleged act. Under the testimony before the trial judge, wherein appellant stated repeatedly that he tried to accomplish the act (as distinguished from his conclusions on appeal that he testified that he had accomplished the act), it might well be that the judge, in giving appellant the benefit of the doctrine of reasonable doubt, accepted his statements that he tried to accomplish the act, and for

that reason did not find him guilty as charged. The judge was not required to find appellant guilty of rape or to find him not guilty of any offense. The evidence was sufficient to support a finding that appellant struck, beat, and choked the prosecutrix with the intent to commit rape. Of course, there could be no basis for a claim that she consented to be so assaulted and battered.

The order denying the motion for a new trial is affirmed.

Shinn, P. J., and Vallée, J., concurred.