**RUPP   v.   TEETS, Warden.**

**No. 33191.**

United States District Court
N. D. California, S. D.

Dec. 21, 1953.

A. J. Zirpoli, Philip Adams, Paul Friedman, San Francisco, Cal., for petitioner.

Edmund G. Brown, Atty. Gen., by Clarence Linn, Deputy Atty. Gen., for respondent.

HARRIS, District Judge.

The petitioner in presenting his petition to this, the United States District Court, for a writ of habeas corpus, contends, among other things, that he was denied the effective assistance of counsel in that his counsel failed to prosecute his application to the Supreme Court of the United States for a writ of certiorari, after affirmance of the judgment of conviction and the death penalty by the Supreme Court of California. Petitioner also claims that a purported confession was obtained as the result of fear, intimidation and lack of mental capacity on the part of petitioner to make a valid confession.

What I said in the Application of Phyle, D.C., 95 F.Supp. 555 at page 557, is again applicable:

> "A District Judge's examination and scrutiny of a petition of this nature is usually attendant with extreme difficulty, for as a rule, applications are presented at a late hour—and often when the condemned man is being made ready for the death-chamber."

The petition, apparently prepared by the petitioner himself, with certain lay assistance, demanded the immediate attention of this Court in the exercise of jurisdiction. Lynch v. Johnston, 9 Cir., 160 F.2d 950.[1] This Court appointed counsel to represent petitioner. In addition, two other lawyers appeared at the request of the petitioner's father and friends of the family.

After hearing brief arguments on the part of the State as well as on behalf of the petitioner on the eve of execution, the Court granted a stay in order to provide an interval to permit the Court to review the transcript of the proceedings before the trial court and the records of the State court proceedings. Thereafter, on the 25th day of November, 1953, an order to show cause was regularly issued.

Through A. J. Zirpoli, the attorney appointed by this Court to represent the petitioner herein, there was filed a supplement and amendment to the petition for writ of habeas corpus, wherein it is set forth in substance that petitioner was denied due process of law in the trial of his cause in the Superior Court of the State of California, in and for the County of Orange, in that his guilt was not ascertained by due regard for those indispensable safeguards nor by observance of the fundamental fairness essential to the very concept of justice, all of which fatally infected the trial.

It is further asserted that petitioner was completely denied the opportunity to present a defense to the charges made against him in that no opportunity was accorded him to present his defense to one of the elements of the crime involved, to wit, the specific intent to commit the crime charged against him. Further, that he was denied the opportunity to present witnesses to show that he was mentally unable to formulate motive, intent, premeditation, deliberation, malice aforethought, the intent to commit rape, or other specific intent.

It is further asserted in said petition that Rupp was required to submit to trial on his plea of not guilty by reason of insanity before the same jury which had previously found him guilty of the crime charged against him and which jury had been prejudiced by the statement of the trial court to the effect that its verdict is "a good verdict."

The facts are set forth in the opinion of the Supreme Court of the State of California, and need no additional recitation. People v. Rupp, 41 Cal.2d ——, 260 P.2d 1.

A shocking crime is disclosed and the character of the case necessarily puts

1. Cf. Thomas v. Teets, 9 Cir., 205 F.2d 236 at page 242.

the law and the administration of criminal justice to a severe test.

At the time of the crime the petitioner, Rupp, was eighteen years and two months old.[2] The unfortunate girl victim was fifteen years of age. Rupp, according to the record, was mentally and physically ill from the time of birth and showed a history of irresponsible, abnormal, dangerous conduct and behavior.

The defense presented the case in the trial court without disputing the homicide, but on the theory that the mental condition of Rupp was involved and that evidence thereof should have been admitted and the same submitted to the jury for consideration in determining premeditation, deliberation, intent, malice aforethought, the degree of guilt and in assessing punishment.

The prosecution presented its case on the plea of not guilty, upon the basis that defendant's mental condition, falling short of the absolute defense of insanity, was not material to the issue presented.

As illustrative of the nature and character of the proof offered, it appears that Dr. Marcus, an eminent psychiatrist, who had the boy under his care for some time after his release from a State institution, would have testified for the defense if permitted, that two days before the homicide he examined the defendant and found his mental condition to be incurable, the defendant, Rupp, to be dangerous to himself and to society and liable at any moment to go into an irrational state of mind and hurt someone, and that he advised the father not to allow defendant to have an automobile or a gun or any dangerous instrument in his possession and to take steps to confine the defendant in a mental institution.

It further appeared through psychiatric findings that as a result of early illnesses, Rupp had suffered serious brain damage. These findings appeared from the encephalograms. Objections were sustained to these offers, as well as similar offers.

The Supreme Court of the State of California in its opinion has very accurately set forth the nature of the offers of proof to which objections were sustained.[3]

---

2. Penal Code Sec. 190: " * * * the death penalty shall not be imposed or inflicted upon any person for murder committed before such person shall have reached the age of eighteen years; * * * ."

3. People v. Rupp, 41 Cal.2d —, 260 P.2d at page 4:

"Several formal offers of proof were made, all of which were substantially similar. They included evidence purporting to show that Rupp had suffered from various illnesses and disorders which might have damaged the tissues of the brain. Abnormal conditions occurring at the time of his birth caused him to be born a 'blue baby', a condition indicating oxygen starvation. During his first year, he suffered from Otis Media, mastoiditis, pneumonia, influenza, and anemia. Subsequently, he became afflicted with intestinal tuberculosis, leukemia and rickets. When he was 3 years old, he underwent seven operations for mastoids, with a possible infection or damage to the brain. Between the ages of 3 and 6, he suffered from spastic convulsions at intervals of about two months, at which times he would become unconscious for periods of 10 or 12 hours with fevers of about 106 degrees.

"This history included a series of abnormal sexual practices which began shortly after he was nine years old and continued until the time of the present action. In 1948, at the age of 14, Rupp committed an assault upon a woman. He entered her bedroom while she was asleep, struck her on the head with a hammer, and then fled. Rupp was apprehended and committed to a State mental hospital for observation. There he was diagnosed as 'not psychotic but (having) a prepsychotic personality. Diagnosis Schizoid Personality Without Psychosis (Fetishism).' He was released on probation to the custody of his parents and placed under the care of a psychiatrist.

"About eight months later, Rupp was involved in an automobile accident in which he struck two girls. Recounting the incident to an examining psychiatrist, Rupp stated that he drove his automobile onto them intentionally in order to

It is now contended before this Court, among other things, that the trial court, in its narrow and circumscribed rulings on the admissibility of offered medical testimony, as well as in connection with the admission of the encephalograms, did violence to the principles announced in People v. Wells, 33 Cal.2d 330, at page 356, et seq., 202 P.2d 53.

Further, the question is posed that the trial jury was only permitted to receive a segment, and thus a distortion, of the otherwise relevant and material evidence as a result of the circumscribed rulings.

Underlying the whole fabric of the contentions advanced is the question of due process. Was the petitioner, Rupp, denied due process in the light of the conduct and rulings of the trial court? If, as it is contended, this question is implicit in the record, is this Court on a petition for habeas corpus foreclosed, at this stage of the proceeding, from a consideration thereof? Before answering, or attempting to answer, the questions posed, it is necessary to briefly allude to certain significant phases of the record, as well as the opinion of the Supreme Court of California. In its opinion the Supreme Court said:

"The controlling inquiry is whether Rupp had the mental state essential to the commission of rape or attempted rape."

In order to determine the mental state or the specific state of mind of Rupp, evidentiary latitude should have been allowed consistent with the pronouncement of the Supreme Court of the State of California in People v. Wells, supra, 33 Cal.2d at page 351, 202 P.2d at page 66:

"Evidence which tends to show legal insanity (likewise, sanity) is not admissible at the first stage of the trial because it is not pertinent to any issue then being litigated; but competent evidence, other than proof of sanity or insanity, which tends to show that a (then presumed) legally sane defendant either did or did not in fact possess the required specific intent or motive is admissible.

"The rule as above enunciated preserves the full effect of the statute as enacted and guards against construction or application of it in such manner as might breach the requirements of due process. To go beyond such rule in excluding evidence would not preserve and enforce the statute but, rather, would extend it beyond its own terms and might transcend constitutional limits."[4]

Defense counsel, representing Rupp in the trial court, attempted to present evi-

have sexual relations with them, but he became frightened and abandoned his purpose. Officially, the occurrence was reported to have been an accident, and no criminal prosecution followed.

"Two encephalographic studies of Rupp were made, one in February, 1949, and another two months after Ruby Ann was killed. They indicated damage to the parts of the brain affecting the thinking, volitional and emotional faculties. A characteristic of this type of injury is to cause 'impulsive, irrational behavior', subjecting a person so afflicted to high sensitivity to stimuli, fainting or epileptic seizures. According to the opinion of the medical experts, Rupp's brain was in this condition at the time of the killing.

"This evidence, Rupp argues, should have been admitted for these purposes: (1) to aid the jury in assessing the penalty; (2) to assist it in fixing the degree of the murder; (3) as direct evidence of, and as a foundation for opinion testimony concerning Rupp's mental capacity to premeditate, deliberate, form malice or intent; and (4) to show unconsciousness."

4. See: Dissenting opinion of Mr. Justice Carter, People v. Wells, supra, 33 Cal.2d at page 360, 202 P.2d at page 72: "I have no doubt that trial judges, counsel and expert witnesses will be completely bewildered when they endeavor, each in his sphere, to apply the rule—to attempt to present and give evidence in a trial under *the plea of not guilty.*"

dence consistent with the rule announced by the Wells case, and on the question of the intent to commit rape, offered testimony through the medium of the psychiatrists. This testimony, in major part, was blocked and objection sustained thereto. As an illustration: Testimony was offered through Dr. Harold Day, psychiatrist and medical authority, that the intent arose from an uncontrollable impulse as a result of destruction of the brain and serious damage to the cortex of the brain.[5] The testimony was stricken by the trial court.

Under the circumstances of this case, did the jury merely have a segment of proof and, at best, a complete distortion, mindful that Rupp was a sexual psychopath who was then suffering and had suffered from brain damage to the extent that his impulses were uncontrollable?

The issue upon which the excluded evidence was offered was a close one. The jurors were in sharp dispute concerning the death penalty. The jury was out twenty-eight and a half hours and it can be reasonably inferred from the record that the argument was whether or not defendant, Rupp, should receive a life sentence or the extreme penalty.

The trial judge limited his instructions to first-degree murder and refused to instruct on any other degree.

"Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree, for murder which is committed in the perpetration or attempt to perpetrate rape is murder of the first degree, whether the killing was

5. R. T. Vol. VI, p. 888, 1. 9 to p. 890, 1. 5:
"By Mr. Meyer: Q. Doctor, do you have an opinion as to whether or not the Defendant William Francis Rupp on August 8, 1952 at the time that he shot the deceased in this place, and within a few seconds before, had the mental ability to premeditate, deliberate, form intent or malice?

"Mr. Devine: To which we object as immaterial.

"The Court: Overruled.

"Mr. Devine: If the Court please he is bringing that down to within a few seconds.

"Mr. Meyer: And when I put it 'away' we are putting it too far away.

"The Court: And I assume Mr. Meyer in asking the question 'within a few seconds' is asking that far there before the offense?

"Mr. Meyer: Yes.

"Witness: At that interval of time over a space of a few moments before the incident I do not feel that he had the capacity to premeditate.

"Q. Or deliberate, form intent or malice aforethought. Is that right? A. At least not in the degree that an average individual would.

"Q. When you answered the question that he didn't have the mental ability to deliberate, premeditate, form intent and malice aforethought, at least not to the

degree that a normal person would, what did you mean by the answer?

"Mr. Devine: We object to that as immaterial.

"The Court: The doctor didn't use the word 'normal' individual. The doctor used the word 'average' individual.

"Mr. Meyer: 'Average' individual. I will substitute the words 'average individual.'

"The Court: The objection will be overruled on that basis, then.

"A. Well, I would answer that in this manner, an average individual who has a normal cortex intact without any evidence of having been diseased, can exercise a greater degree of volitional control over his sexual impulses even though the sexual impulses become rather intense. Whereas an individual who has an impairment of his cortex doesn't have that machinery which is necessary to inhibit, under the duress of strong sexual impulse, that sexual impulse; he just simply hasn't the machinery to do it with, and therefore will act impulsively.

"Mr. Devine: We move that all be stricken because 'impulse' is not a factor in this case. All of the answer is immaterial for the purposes of this case and we move it be stricken. It is going far afield from the narrow limits in this particular type of case as to this kind of testimony.

"The Court: Yes, I will have to grant the motion."

intentional or unintentional or accidental." (Clerk's Tr. 36.)

There was no alternative for the jury but to find first degree or release the defendant.

In a case of comparable gravity and perhaps even more extreme on the facts, People v. Lindley, 26 Cal.2d 780, 161 P.2d 227, the Supreme Court of California approved an instruction on second degree.

The colloquy with the court and jury is footnoted herein.[6]

6. R. T. Vol. VI, p. 1020, 1. 25 to p. 1024, 1. 26:

"The Court: Is there some question?

"Foreman: There is a question of one or two jurors in the case of life imprisonment, would it be forever, or would there be any loophole? That came up and I had to ask the question.

"The Court: The only answer I can give you on that, ladies and gentlemen of the jury, is that you just have the duties to find the individual guilty or not guilty, and if you find him guilty as to first degree murder the first one would be guilty of murder in the first degree, and the second one to recommend life imprisonment. I can't tell you what would happen.

"Foreman: It is just a recommendation then?

"The Court: Yes.

"Mr. Meyer: May we approach the bench?

"(Discussion between Court and counsel without the hearing of the jury.)

"The Court: When you said 'recommendation' that is the sentence that will be conferred upon the Defendant will be life imprisonment in the State Penitentiary. In other words, the Court would be bound to commit the Defendant for life imprisonment.

"A Juror: Is there any provision that could be added to that?

"The Court: That is entirely up to you folks. As to whether the Court will pay any attention to it it is another thing.

"A Juror: Thank you.

"5:04. Jury retired to the jury room.

"8:35 p. m. (Stipulated the jury and the alternate are present.)

"The Court: May I ask you, Mr. Jackson, you said you wanted further information?

"Foreman: Yes. There is a little confusion and misunderstanding.

"A Juror: I would like to know if there is any way we can get the definition of the law book read to us on the meaning of life sentence, and also what it means, as we are laymen and a little confused as to just what it means as to the possibilities through the law book on parole and so forth. Is that possible? Maybe I didn't word it right.

"The Court: Yes, I think what you want me to tell you is just what would take place if you would return a verdict of guilty with life sentence?

"Juror: Yes, and also the provisions of parole on it as the law says it.

"The Court: That is all of your question then?

"The Juror: Yes.

"The Court: I will have to come back to one thing, that the jury has, as I stated before just this duty to determine first if an offense has been committed, and if the offense was committed who committed it, and after a determination of who did commit it then in this particular case you have three alternates, either you find the Defendant not guilty, or you find him guilty of murder in the first degree, without any recommendations, which as has been stated to you would mean that he would be put to death, and the other alternate is that you find the Defendant guilty of first degree murder with a recommendation that he be confined in the State Prison for life. Now, that is as far as I can go and as far as you should be interested in it. It is up to you to determine which one of those sentences. You are in the same position now as though you were trying any other type of case, a murder case, as far as the actual punishment is concerned; the jury has no right to take that into consideration. In other words, if you give him a life sentence that is as far as you can go. What the Parole Board does with the matter, that is entirely in their hands and not in your hands. I don't know whether I have made myself clear.

"A Juror: In other words, what you are trying to say, Your Honor, if you will excuse me, as I am a layman, life sentence doesn't necessarily mean a life sentence?

"The Court: I can't answer your question, I want to be very frank with you.

"A Juror: I am sorry we don't understand, too.

Addressing myself to the questions of the available remedy: Questions of a federal nature may be raised in the State court on habeas corpus and in the present posture of the case petitioner has the right, by an available procedure, that is, habeas corpus, to raise the questions implicit herein.

Whether the Supreme Court of the United States would have granted certiorari had a timely petition been filed by counsel for petitioner in the State courts is debatable. Cf. Opinion of Mr. Justice Frankfurter in Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382. However, in the present state of the record I believe that I am bound by the decision of our Court of Appeals in Duffy v. Wells, 201 F.2d 503 at page 506.

It may be inferred that our Court of Appeals considered the evidence in the Wells case concerning malice aforethought as improperly excluded; nevertheless, it accepted the reasoning and conclusion of the Supreme Court of California that the case was not a "close one," and that the error was cured by the provisions of Article VI, Section 4½ of the Constitution of the State of California.

In this regard the Supreme Court of California said:

"The issue upon which the improperly excluded evidence was offered does not, however, appear to have been a *close one.* In accord with the mandate of section 4½ of Article VI of the state Constitution we have examined the entire cause, including the evidence, and have concluded that the rejection of the physicians' proffered testimonies did not result in a miscarriage of justice." (Italics ours.) People v. Wells, 33 Cal.2d 330 at page 357, 202 P.2d at page 70.

Whether the United States Court of Appeals would consider that the exclusion of evidence by the trial court in the case at bar transcended constitutional limitations, and resulted in a deprivation of due process, might be considered an open question. At least, it may be subject to judicial clarification.

Petitioner's counsel stated at the time of the oral discussion that he was desirous of presenting extrinsic evidence with respect to alleged threats and intimidation and asserted coercion in obtaining a confession from petitioner. In this connection, petitioner stated in his handwritten petition:

"All I know is that once they got me to say what they wanted they kept having me confess over and I

"The Court: In other words, it has to be the jury's determination of either death sentence or the life sentence. What happens to him after that is the business of either the Court or the Parole Board.

"A Juror: Even though the jury does impose the life sentence there is always a possibility of parole?

"The Court: I am sorry, I can't answer that question for you.

"A Juror: That is the big question in the jurors' minds.

"A Juror: Can you read the definition of life imprisonment?

"The Court: The definition of it is just what is says.

"A Juror: Life imprisonment?

"The Court: Yes, ma'am. That is as far as I can go.

"The Foreman: I guess that is all,

Your Honor. Sorry to have troubled you.

"The Court: That is all right, no trouble at all. That is what we are here for.

"8:40 p. m. Jury retired to jury room.

"11:34 p. m. (Stipulated jury and alternate present.)

"The Court: Now, Mr. Jackson, as foreman of the jury, I just want you to tell me just in numbers how you stand.

"Foreman: We are six to six.

"The Court: How long have you been six to six.?

"Foreman: That has been from the first ballot. It varied a little bit, but has gone back to the original.

"The Court: Well, I am going to send you jurors back to the jury room to do a little discussing on the matter. I haven't heard you doing anything lately, so I think I had better go back and do it over."

did even though what I was saying wasn't the truth. It couldn't have been. It wasn't the truth because I read and heard where they had me telling them things about the crime that I don't remember even now."

I have examined the transcript of the trial proceedings and can find no testimony therein that would indicate this confession was obtained as the result of coercive tactics, or as the result of threats. However, the confession, or purported confession, perhaps should have been viewed by the trial jury in view of the psychiatric aspects of the case, as well as the mental capacity of the defendant to entertain *"intent"* or *"malice aforethought."* Whether the jury was accorded this opportunity is again one of the provocative questions implicit in this record.

Since this case was brought to my judicial attention I have received many communications both commending and condemning the Federal Court for staying the execution of this unfortunate petitioner pending a study of the problem and the attendant record. Some of the communications address themselves to matters of executive clemency which are beyond the province of this Court; others to the need and requirement of a revision of the law as it applies to State court practice and procedure, falling within the legislative functions.

The nature and operation of the mind and its processes are so intangible to the grasp of common understanding, that the basis for enacting standards of criminal responsibility, and the means for determining whether those standards are satisfied in a particular case, have greatly troubled law and medicine for over a century.

Only by integrating scientific advancements with our ideas of justice, can we advance the administration of criminal jurisprudence.

Collateral to these proceedings, Dr. Douglas M. Kelley, a noted psychiatrist and professor of criminology at the University of California, offered certain observations at an institute session for prosecuting attorneys which are particularly applicable with respect to the sociological and psychiatric features of this case. He said:

"Modern medical methods are all but outlawed from the criminal courtroom by narrow and archaic legal rules.  *  *  *

"So much so, that the psychiatrist and the prosecutor don't even speak the same language.  *  *  *

"And the result is sometimes poor administration of justice, sometimes a serious miscarriage of justice. *  *  * "

See also Federal Probation Sept. 1953, p. 8. "The M'Naghten Rule in Its Present-Day Setting" by Henry Weihofen.

## Conclusion

This proceeding should not be regarded as an intrusive attempt on the part of the United States District Court to review mere asserted errors of law or irregularities committed by the State court. United States ex rel. Bongiorno v. Ragen, 7 Cir., 1945, 146 F.2d 349; United States ex rel. Carr v. Martin, 2 Cir., 1949, 172 F.2d 519.

█ Rather, the basic and vexing problem is: Was petitioner, Rupp, afforded the fundamental fairness essential to the very concept of justice, and did the trial court go beyond the rule announced in People v. Wells, supra, in excluding evidence and extending Section 1026, Penal Code of the State of California [7] beyond its own terms, thus transcending constitutional limits.

7. Sec. 1026. "When a defendant pleads not guilty by reason of insanity, and also joins with it another plea, or pleas, he shall first be tried as if he had entered such other plea or pleas only, and in such trial he shall be conclusively presumed to have been sane at the time the offense is alleged to have been committed. If the jury shall find the defendant guilty, or if the defendant pleads only not guilty by reason of insanity, then the question whether the defendant was sane or in-

■ At this stage of the proceedings, however, it appears that petitioner has available to him an adequate State remedy on habeas corpus which has not been exhausted. Consult Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397.

Accordingly, the order to show cause herein is discharged and the petition for writ of habeas corpus is dismissed.

sane at the time the offense was committed shall be promptly tried, either

