[Crim. No. 3615. In Bank.—September 26, 1933.]

THE PEOPLE, Respondent, v. GLEN W. JOHNSON, Appellant.

Davis & Freed, George T. Davis and Eli Freed for Appellant.

Chandler & Quayle and Edward J. Bloom, as *Amici Curiae* on Behalf of Appellant.

U. S. Webb, Attorney-General, and Seibert L. Sefton, Deputy Attorney-General, for Respondent.

SHENK, J.—In a prosecution of the defendant for murder the death penalty was imposed.

By information the defendant was charged with the murder of Harry F. Darling on the eighth day of June, 1932, in the city and county of San Francisco. By a second information he was charged with the murder of Mervin Reardon at the same time and place. He was also duly charged with a prior conviction of a felony, to wit: grand larceny, and the service of a state prison sentence therefor in the state of Utah. He entered pleas of not guilty and not guilty by reason of insanity to the charges of murder and denied the prior conviction. At the beginning of the trial the

defendant withdrew his denial of the prior conviction and admitted the same. The murder charges were tried together. After the verdicts of guilty were returned, the defendant withdrew his pleas of not guilty by reason of insanity. He appeals from the judgments and from an order denying his motion for a new trial.

The facts and circumstances attending the homicides were presented by the prosecution and are undisputed in every material respect.

About 9 o'clock in the evening of June 8, 1932, the kitchen door-bell rang at the residence of Andrew J. Bell located at 206 Justin Drive, in St. Mary's Park, a residential section of the city. Mr. Bell, a police officer of the San Francisco police department, was on duty from midnight until 8 A. M. and had retired shortly after 7 o'clock on the 8th. Mrs. Bell had also retired. She heard the bell ring, but refrained from responding to the signal until she heard a "fumbling" of the door-knob. She opened the door and saw two men with flashlights. She screamed and Officer Bell responded in time to observe the two men make their get-away into the night. At the trial Mrs. Bell identified the defendant herein as one of the two men. Officer Bell requested his wife to notify the Ingleside police station at once by telephone of the suspicious presence of the men in the neighborhood, which was done, and Bell proceeded to dress in preparation for the pursuit. Three police officers responded to the call on motorcycles and a search of the neighborhood was begun. At 9:50 a police radio message was sent out that there were burglars in the house at 256 Justin Drive, which was several doors removed from the residence of Officer Bell, but on the same street. Bertel A. Nelson lived at 256 Justin Drive with his wife, but on that evening they were away from home. The deceased Harry F. Darling, who resided next door to the Nelsons, saw two men enter the Nelson house and notified the police department. In response to the resulting police radio call, numerous police officers proceeded to Justin Drive, including Officer Reardon, the decedent, and Officers McKenna, Cook, Loftus, Garrick and McGreevy. When they arrived on the street they met Officer Bell and the police officers who had responded to the call sent in by Mrs. Bell and immediately inquired about the location of 256 Justin Drive,

as they had been notified to investigate a burglary at that address. Upon being notified of the location the officers surrounded the house and proceeded to gain entrance thereto. Officers Reardon, McKenna and McGreevy entered through the basement door and turned on the lights in the kitchen, hallway, breakfast room and on the front porch. Officer McKenna then let Officer Bell and civilian Darling in the front door. Officer Cook, who had gone to the rear of the house, saw by means of a flashlight a man in the house at one of the bedroom windows. Cook called to the officers inside that a man was in the bedroom and Bell heard the call. Officer McKenna searched the east bedroom. In a closet in the bedroom Officer Bell saw a man's hand on top of a large cardboard box. Bell commanded the man behind the box to come forth and upon his refusal fired a pistol shot into the frame of the closet door; whereupon one Benn Moore, the confederate of the defendant herein, appeared. Moore was immediately handcuffed by Officer McKenna. The party then proceeded with Moore into the living-room. At the same time Moore was questioned as to where his partner was. He replied that he had been there, but that he did not know where he then was. As the officers were questioning Moore, the latter complained that the handcuffs were too tight and requested Officer McKenna to loosen them, which he did. Then Officer Reardon exclaimed: "There is somebody behind there," pointing to the radio which was standing near the corner of the room. Thereupon Officers Reardon, Bell, Loftus and civilian Darling started toward the radio. Officer Reardon took the lead and moved the radio slightly. As he did so the defendant emerged from behind the radio and fired five shots from his revolver in rapid succession. The first shot mortally wounded Officer Reardon. There were powder burns on his clothing where the bullet entered his body. The second shot mortally wounded civilian Darling. The third shot wounded Officer Bell, the fourth wounded Officer Loftus, and the fifth was aimed at Officer McKenna, but missed him and the bullet lodged in the wall of the room. The wounded officers returned the fire and the defendant was hit in three places, but he survived after a season in the hospital. Simultaneously Moore broke away from Officer McKenna and attempted to approach the defendant, whereupon Officer

McKenna shot Moore down, inflicting a wound from which Moore died. Officer McKenna then took the gun from the defendant's hand and removed the five empty cartridges. This gun was a .38 calibre five-cylinder revolver and the same was received in evidence.

No extenuating circumstances were shown. The defendant did not take the stand and the evidence produced on his behalf did not even tend to contradict the evidence on behalf of the People as to what took place at the time of the homicides. Counsel for the defendant endeavored to inject into the case the element of extenuation by offering an instruction to the effect that if the jury should believe that the defendant entered the house at 256 Justin Drive and that at the time of such entry he did not intend to commit theft, but had a different kind of intention, "such as an intent to use the house for a hiding place", then he was no more than a trespasser and could not be found guilty of the intent necessary to make him guilty of burglary; that in such event he could not be found guilty of murder in the first degree unless he should be found guilty of the specific intent to commit murder. An instruction on manslaughter was also offered. ■ The court properly refused these instructions because of the absence of evidence to support them. Counsel intimated in his examination of prospective jurors that evidence would be produced which would justify such instructions, but none was produced. The evidence conclusively shows that on the evening of June 8th entrance was gained to the house of Officer Bell at 206 Justin Drive by means of a glass-cutter, and that the defendant and Moore entered the house at 256 Justin Drive by breaking off boards from a window and cutting the glass near the catch with a glass-cutter. After his arrest a glass-cutter was found on the person of the defendant; also a set of keys and two .38 bullets were taken from him. It was also shown without contradiction that just before the shooting affray the bureau drawers in the bedrooms at 256 Justin Drive were opened and the contents strewn over the room; that two small banks in the house had been opened with an instrument or tool and the money therein, consisting of numerous small coins, had been removed. A pair of nippers or small pruning shears were taken from the person of Moore. From these and other facts in the record, and with

no explanation to counteract the plain inferences to be drawn therefrom, the court in the first instance was compelled, and thereafter the jury was justified, in concluding that the defendant and his confederate had entered the house with burglarious intent, and that the killing was murder in the first degree as provided in section 189 of the Penal Code. Likewise, there is no room for a legitimate inference that the defendant was in the house at the time merely as a refuge or hiding place. There was also no warrant under the facts for the giving of an instruction on manslaughter.

During the course of the trial the defendant's counsel moved the court for an order directing the occupant of the premises at 256 Justin Drive and the members of the police department to permit counsel for the defendant to enter the house and examine and inspect the scene of the crime, for the purpose of obtaining evidence. The denial of the motion is urged as prejudicial error. Assuming that the court had the power to make such an order, there was no sufficient showing in this case to justify it. Under section 1119 of the Penal Code the court is authorized, in its discretion, to order that the jury be taken to the place where the offense is alleged to have been committed for the purpose of inspection, but we are not advised of any authority in the court to make an order merely on motion and without a sufficient showing, including the consent of the occupant of the premises, permitting counsel for a party to enter the private premises of another for such a purpose. If the occupant consent and the members of the police department were to obstruct counsel in making an inspection the court undoubtedly could, upon a proper showing, control and direct the activities of the police in that respect. But, as stated, no sufficient showing was made in this case and the assignment of error is without merit.

Counsel complains of certain language used by the assistant district attorney in his argument to the jury and assigns such language as misconduct. The testimony throughout the trial showed that .38 bullets were used at the time of the affray. All of the witnesses who testified on that subject so stated. On cross-examination of Officer McKenna defendant's counsel sought to impeach the witness by the production of the record of his testimony at the coroner's inquest. The transcript of this record represented

this witness as stating that a .32 revolver was taken from the defendant at the time of his arrest. The witness promptly stated that the report of his testimony at the inquest was a clerical error; that the revolver taken from the .defendant was a .38 and that his written report showed that it was a .38. Defendant's counsel attempted to make much of this discrepancy and stated in his argument that he wanted to cross-examine Sergeant Latulipe further as a ballistic expert, but could not do so because that officer was a witness in the federal court. In the course of his reply the assistant district attorney referred to a portion of the argument of the defendant's counsel as follows: ''That is all 'boloney' about the ballistic expert. . . . All that Sergeant Latulipe could have done within reason is this: He could have said, 'Yes, I put those bullets under a microscope,' or whatever instrument they use, and that bullet came out of a .38 calibre revolver'. And that is all he could have said.'' It is contended that the first statement is unjustifiable ridicule of opposing counsel's argument, and that the second statement was a positive statement of a fact which was not true. The statements complained of must be considered in the light of the record, which discloses that although Sergeant Latulipe was detained in another court at the time the defendant's counsel desired further to cross-examine him, to wit, on October 14th, the defense rested on October 19th, five days later, and there was no attempt on behalf of the defendant in the meantime to call the sergeant as his witness or for further cross-examination.

The term ''boloney'' may be said to have acquired a generally accepted meaning as a slang expression. Funk and Wagnalls' New Standard Dictionary of 1932 defines it as ''stuff and nonsense''. If the definition had been used in the argument instead of the term itself, it could not be said that it would have been outside the realm of legitimate argument. The jury undoubtedly understood the term in its generally accepted sense, which corresponds to the accredited definition, and although the use of the term may be said to have been undignified, we are unable to conclude that the rights of the defendant were prejudicially affected thereby. The same conclusion must be reached as to the other language complained of when the whole record is taken into consideration.

■ The final contention in support of the appeal is that the rights of the defendant were prejudiced by reason of the fact that during the closing argument of the assistant district attorney, the defendant's counsel was declared by the court to be guilty of contempt. During the course of the trial there had been much acrimony between counsel, and such as would provoke justifiable reproof on the part of the court. The record shows that throughout the trial the court had been patient and considerate of the defendant's counsel and solicitous for the rights of the defendant. At numerous times the court had felt called upon to direct counsel for the defendant as to his proper conduct and frequently admonished him as to his demeanor. Finally, during the closing argument of the assistant district attorney and immediately following the second remark assigned as misconduct and above quoted, the defendant's counsel interjected: ''That is a lie.'' Whereupon the court declared counsel for the defendant guilty of contempt and directed the bailiff to take him in charge. Said counsel was not, however, removed from the courtroom and was permitted thereafter with his co-counsel to participate in the proceedings. It is not reasonable to assume that the result would have been different if this incident had not taken place.

We find nothing in the record to warrant a reversal. The judgments and the order denying the motion for a new trial are therefore affirmed.

Seawell, J., Thompson, J., Curtis, J., Langdon, J., Spence, J., *pro tem.*, and Waste, C. J., concurred.

Rehearing denied.