[Crim. No. 4960. In Bank. Mar. 11, 1949.]

THE PEOPLE, Respondent, v. WILLIAM H. SANFORD, Appellant.

Gerald J. Kenny, Public Defender, and William L. Ferndon, Deputy Public Defender, for Appellant.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

CARTER, J.—This is an automatic appeal from a judgment imposing the death penalty for murder in the first degree, and from an order denying defendant's motion for a new trial. The defendant, William Sanford, came to San Francisco from Ben Lomond about the 14th of June, 1948. He lived in various cheap hotels in the Mission District for a period of about a week, but then decided he would rather live in a private home. He walked about the district until he saw a sign advertising rooms for rent in a flat at 719 Capp Street. On either June 18th or 19th, 1948, he rented a room in the flat from Mrs. Felippa Griffiths, the victim. The rent receipt for $5.00 for the first week, which he paid in advance, was made out by one of the other roomers, a Mr. Cohn, at the request of Mrs. Griffiths. During the period of time that he resided in the flat he was not working and spent most of his time in his room. In order to explain this, he informed Mrs. Griffiths that he had been in the service, that he had a bad heart and that he was under medical treatment at Oak Knoll Hospital in Oakland. With the exception of some service in the Coast Guard, the other statements were untrue.

The defendant, a man about 20 years of age, gained the confidence of Mrs. Griffiths (a woman about 55 years of age) by telling her of his war service. Mrs. Griffiths' son had been killed while serving in the armed forces overseas, and his body was being sent back to San Francisco for burial. It appears that the defendant endeared himself to her by telling her that he had been present and knew that the boys who had been killed while in the service had been given proper burials and that a priest had been in attendance. Mrs. Griffiths, by the defendant's own admission, treated him like a son.

The defendant did not testify in his own behalf, and the evidence adduced at the trial was given by others, including police officers who were called to the scene of the crime, and who testified to the facts as related to them by the defendant after his arrest, and to the events which took place while the defendant was in their custody. It appears that he talked freely and voluntarily, offering information as to his past, his reason for coming to San Francisco, admitted committing the crime, and his reasons for killing Mrs. Griffiths. He told the officers that he had come to San Francisco to kill a girl, one Rita Gerstman, to whom he had once been engaged but who had broken their engagement when he started getting in trouble. When he arrived, he had no gun and no money with which to buy one, After seeing the girl again, he decided not to kill her, but to embark on a series of robberies and holdups as a way to make his living. However, he had no gun and it was necessary for him to obtain one. He then formulated the plan of robbing Mrs. Griffiths and the other occupants of the flat so that he could get money with which to buy the gun so that he could carry out his purpose. He made his plans for Monday, June 28, 1948, knowing that the other roomers would be away at work. He first thought, so he told the officers, of using a heavy vase which was in the hall but felt that her suspicions would be aroused if he appeared at the door of her room with it in his hand and so abandoned that plan. During the time he had lived in the flat he had done some odd jobs around the house and knew that she kept a tool chest in a closet off the back porch. He knocked at the door of Mrs. Griffiths' room, and told her that the hasp or catch on his suitcase was broken and that he needed a wrench with which to repair it, intending to use the wrench as a weapon with which to kill her and thus obtain any money she had, and the keys to the other rooms. She went out on the back porch with him, and opened the tool chest in the closet. She, while in a kneeling position, handed him a monkey wrench and he told her it was too large and not what he wanted; she next handed him a 14-inch Stillson wrench which he also told her was too large, but this wrench he kept in his hand. While she was still going through the chest he raised the Stillson wrench and struck her on the back of the head. She slumped forward and he said that he struck her again when she gave a little scream. At this blow, the blood started to spurt from the wound and so he took some loose clothing which was in the closet and put it over her head

and continued beating her on the head with the wrench until he was sure she was dead. In striking her on the back of the head he inflicted injuries so severe that the brain itself was exposed and the skull completely crushed. After this, he took the keys to the other rooms from a nail in the kitchen and, after taking a small amount of jewelry which belonged to Mrs. Griffiths and which he found in the kitchen, he ransacked the other rooms taking clothing, money and a radio therefrom. During the hour and a half that he remained in the house he went back to the porch every three or four minutes to be sure that the woman was dead. He put the articles he had obtained in a suitcase which belonged to Mrs. Griffiths. Before leaving the house, he found the current receipt book in which she kept the record of the rents which had been paid to her, and tore out the stub which bore his name. This was later found in his possession.

After leaving the house he called a man by the name of Fisher who, apparently, was a dealer in stolen property. He then left the articles at a restaurant on Mission Street where Fisher was to pick them up.

The body was not found until Tuesday by the daughter of the deceased. After the defendant had completed his ransacking of the flat he had locked both the kitchen and the back door so that when the daughter arrived to visit her mother she was unable to gain access to the premises, and it was only when the lock on the door was broken that she found her mother. When the police arrived they found the current rent receipt book with the one missing stub. The other roomers were questioned, and it was finally discovered that Mr. Cohn, who was then on a vacation trip to Oregon, was the one who had made out that particular receipt. Upon being questioned by the Oregon police, he remembered to whom it had been made out—a young man by the name of William Sanford. The police, having the description and name of the defendant, discovered that there were Sanfords living at No. 12 30th Street in San Francisco. These premises were watched for approximately eight hours. At about 2 o'clock in the morning they saw a man leave, go to a restaurant and buy some pie and a newspaper. They then entered the house and found the defendant in one of the bedrooms under the bed. He was at once placed under arrest, and when he was searched, the police officers found in his pocket the stub of the rent receipt which had been missing from the book. When the defendant was informed that he was being arrested for a murder which

had occurred at 719 Capp Street, he said "Yes, I did." In his room was found an article of clothing which had been taken from the flat. The defendant told the officers where he had left the suitcase containing the other articles and that Fisher was to pick it up. The officers and the defendant then went to the home of Fisher who told them that after reading the newspaper account of the murder and Sanford's connection with it that he had segregated the clothing and the jewelry. The clothing and radio he had taken to the home of a man named Chouiela on Prospect Street and the jewelry he had tied in a handkerchief and thrown it over a cliff. The clothing and radio were found at Chouiela's residence, and the jewelry was later found in the spot where Fisher had thrown it. All of the clothing, jewelry and the radio were identified at the trial as having come from the residence of Mrs. Griffiths, and from the rooms of the other occupants of the flat.

At all times during the search for the articles the defendant was present with the officers. He talked voluntarily and replied freely when questions were put to him. The officers testified that the defendant readily admitted the crime and his other actions; he said that he expected the extreme penalty for his act, and that he was familiar with the fact that murder committed in the act of a robbery or burglary was murder of the first degree; he also said that he wanted the extreme penalty.

The jury, after deliberating one hour, found the defendant guilty of murder of the first degree without recommendation. After the verdict was in, defendant's counsel expressed to the court the desire of defendant, evidently formulated after the jury retired to deliberate, that his plea of "not guilty and not guilty by reason of insanity" be withdrawn, and that this was his wish regardless of what the verdict might be. The court inquired of defendant if that was what he wanted, and he answered that it was. Permission was then granted that the plea of "not guilty and not guilty by reason of insanity" be withdrawn. At the request of the assistant district attorney, to which no objection was made by counsel for defendant, the report of three alienists appointed by the court to determine the sanity of defendant was incorporated in the motion. This report set forth the defendant's family background; a report of various crimes, arrests and sentences served by defendant; the details of the present crime; his manner, his physical condition; his purpose of robbery in

killing Mrs. Griffiths. The report concluded that the defendant was sane and of more than normal intelligence; that he had planned the act, knew its quality and nature, and that he was fully responsible.

The defendant, in his motion for a new trial upon all of the statutory grounds, further contended that the evidence was insufficient to sustain the verdict, and assigned as error an instruction given to the jury that the only possible finding under the law would be that this was murder of the first degree. The motion for a new trial was denied. There was no instruction which could possibly be construed as defendant's counsel contends. After the verdict was in, and the jurors were polled, the court made the following statement: "Ladies and Gentlemen, I know you have had a serious and very important decision to make. I think you made the only possible decision you could make in this case. I want to thank (you) for your attention and for your excellent service which you always render in this Court. You will be discharged now until further order."

The defendant contends here that the provision of section 1126 of the Penal Code, which provides that questions of fact are to be decided by the jury, was overlooked by the trial judge when he gave the following instruction to the jury:

"Although there are two degrees of murder, the evidence in this case is such that either the defendant is innocent of the charge of murder or he is guilty of murder in the first degree, for murder which is committed in perpetration or attempt to perpetrate robbery or burglary is murder in the first degree, whether the killing was intentional, unintentional or accidental." It is contended that this instruction constitutes reversible error in that it, in effect, deprived the defendant of a jury trial by taking from the jury the determination of questions of fact.

There is no merit in defendant's contention. Instructions are to be given with reference to the facts in evidence. The evidence presented at the trial by the People pointed indisputably to a homicide committed in the act of committing a felony—robbery or burglary, and no defense whatsoever was offered by the defendant. It is proper in such a case for the court to advise the jury that the defendant is either guilty or innocent of first degree murder. *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627]; *People* v. *Perkins,* 8 Cal.2d 502 [66 P.2d 631]; *People* v. *Johnson,* 219 Cal. 72 [25 P.2d 408]. The instructions as a whole correctly stated the law and it is

not contended that the defendant was not otherwise accorded a fair trial. ██ The verdict was clearly justified by the evidence, and we find no basis whatever to disturb the judgment.

The judgment and order are, and each of them is, accordingly affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.