[Crim. No. 6010. Third Dist. July 23, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT FUSARO, Defendant and Appellant.

882

**COUNSEL**

Peter H. Smurr for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Edward A. Hinz, Jr., Charles P. Just and Roger E. Venturi, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**FRIEDMAN, J.**—A jury trial resulted in defendant's conviction of four separate narcotic offenses: (a) sale of a restricted dangerous drug on October 30, 1969 (Health & Saf. Code, § 11912); (b) possession for sale of a restricted dangerous drug on November 19, 1969 (Health & Saf. Code, § 11911); (c) possession of heroin on November 19, 1969 (Health & Saf. Code, § 11500), (d) sale of a restricted dangerous drug on November 13, 1969 (Health & Saf. Code, § 11912).

Defendant operated a garage under the name of Bob's Automotive Service. On October 30, 1969, Maureen Ates, a police informer who was acquainted with defendant, went to the garage to purchase narcotics from him. Miss Ates and Charlene Fowler, a detective, entered the garage and talked to defendant in the office portion of the building. Miss Ates asked to purchase methedrine and defendant told them to return later the same evening. Later that evening Miss Ates and Detective Fowler again entered the office, the door of which was open. He was heard to say to another man that he could supply a pound of methedrine a week. He went to a file cabinet located in the office and removed two plastic baggies. He poured the contents of the baggies into a plate and agreed to sell the two women 12 "spoons" for $100. He measured out the powder, placed it in a plastic bag and handed the bag to Miss Ates, who handed him marked money. He poured the remainder of the powder into a leather pouch. Subsequently Miss Ates turned the contraband over to Detective Fowler, who gave it to Gorman, a narcotics agent. The material defendant sold the two women consisted of 8.5 grams of amphetamine.

On November 12, 1969, Agent Gorman, Detective Fowler, Inspector Nance and Sergeant Keller met at the home of an informer named Diana Lauck. Diana, also known as Angel, had been a drug user and had purchased drugs from defendant on several prior occasions. She had gone to the police and offered to cooperate with them. Diana placed a telephone call to defendant at the garage and talked to him about the purchase of drugs. He told her to come to the garage in about 20 minutes. The police drove Diana to the garage where they gave her a $20 bill. At approximately midnight she entered the garage and was inside for about 15 minutes. Defendant was in the garage when she entered. They had a conversation concerning drugs. Defendant went to a back room, upon returning took a baggie from a metal box and measured out a spoonful of white powder into a smaller bag and returned the baggie to the metal box. He gave the smaller bag to Diana and she gave him the $20 bill. She left the garage and gave the bag to Detective Fowler, who turned it over to Agent Gorman. The baggie contained .5 grams of amphetamine. The officers then

went to a restaurant where Detective Fowler took Diana into a restroom, searched her and determined that she did not have the money which had been furnished her.

On November 18, 1969, a search warrant was served at defendant's garage. The garage was not open for business and the doors were closed. The officers knocked on the outside door, identified themselves and informed the person who answered the knock that they had a search warrant. They were admitted. Two officers went to the office, which was closed. The officers knocked, identified themselves and informed the occupants that they had a search warrant. They could hear activity inside but no one opened the door. The officers repeated their identification, then opened the door and went into the office. They found five people there. The officers searched the room, including the cabinet in the office. They discovered a leather pouch in which was a balloon containing heroin, a fully loaded nine millimeter pistol, injection paraphernalia consisting of syringe and needles, a spoon with white residue on it, .7 grams amphetamine, and dextro-amphetamine in the amount of 59.5 grams.

Defendant was not at the garage at the time of the search. The cabinet in which the contraband was found was the same cabinet from which defendant had taken the drug on the night of October 30 and the leather pouch in the cabinet was identified as the one used by defendant on the night of October 30. On November 20 defendant was arrested. He was examined and several needle marks were discovered on his arm.

The defense adduced evidence attempting to show that the drugs were sold by a garage employee named McKay rather than defendant; that defendant was wearing a full beard during the latter part of 1969; that the prosecution evidence indicated that the person who made the sales was beardless. There was evidence that defendant had grown a beard in July but that he had shaved it off a few days before the offenses. On rebuttal the prosecution adduced evidence tending to show that defendant did not have a beard at the time of the offenses; that McKay, the employee alleged to have made the sales, did not resemble defendant and was not the person who sold the narcotics.

### Claim of Perjury

Defendant argues that conviction of the November 13 offense was procured through the perjured testimony of Diana Lauck, the only "percipient" witness to the offense. On direct examination Diana testified to three prior narcotic purchases from defendant. On cross-examination she was impeached by her testimony at the preliminary examination denying prior purchases. Still on cross-examination she explained that she was frightened

at the time of the preliminary examination, because she had just been discharged from the hospital after being stabbed. In response to further cross-examination she said that defendant was not the one who had stabbed her. On redirect examination by the prosecutor, she testified that she had been stabbed by Gary Motheral, who had narcotic transactions with defendant. On appeal defendant accuses Diana Lauck of perjury in testifying that Gary Motheral had stabbed her. Defendant resorts to the inacceptable technique of attaching affidavits to his appeal briefs. These affidavits by Leona Fusaro, wife of defendant, and Gary Motheral are to the general effect that Diana was a narcotics user and had cut her wrists, then stabbed herself.

At this point defendant is resorting to a bootstrap stratagem. Diana's alleged perjury was not the subject of testimony at the trial. ■ Statements of alleged fact in the briefs which are outside the record will be disregarded on appeal. (*Knapp* v. *City of Newport Beach,* 186 Cal.App. 2d 669 [9 Cal.Rptr. 90].) ■ True, a conviction will be set aside on collateral attack where perjured testimony was an essential element and was knowingly presented by the prosecution. (*In re Mitchell,* 35 Cal.2d 849, 856 [221 P.2d 689].) The alleged perjury of Diana Lauck was not an essential element. The truth or falsity of her story of the stabbing was not relevant to the issue before the jury, that is, whether defendant had sold her amphetamine on November 13. ■ An attempt to prove a witness' untrustworthiness concerning a matter which is not relevant and not the subject of independent proof represents impeachment on a "collateral" matter which the law permits the trial court to exclude in its discretion. (Witkin, Cal. Evidence (2d ed. 1966) § 1259.) ■ "A party cannot cross-examine his adversary's witness upon irrelevant matters, for the purpose of eliciting something to be contradicted." (*People* v. *Dye,* 75 Cal. 108, 112 [16 P. 537].) Had the defense attempted at the trial to show that Diana had lied regarding her stab wound, the exclusion of such evidence would not have constituted prejudicial error, because the transaction involved a collateral matter. (See, e.g., *People* v. *Howes,* 99 Cal.App.2d 808, 822 [222 P.2d 969].) Defendant's affidavits are inadmissible, establish no ground for reversal and would merit no inquiry in any proceeding in any forum.

### Misconduct of Prosecutor

Defendant alleges that the prosecuting attorney indulged in prejudicial misconduct by displaying two photographs to the jury prior to their admission in evidence. A photograph of a door with a peephole in defendant's garage was shown to witness Fowler. Mr. Klein, defendant's trial counsel,

requested to *voir dire* the witness as to the photograph and the jurors were excused. As they walked out, Mr. Osmundson, the deputy district attorney, was standing in front of them with the picture in his hands so that they could see it. Defense counsel objected and Mr. Osmundson told the court that he did not intentionally hold the picture in such a way that the jurors could see it. The picture was admitted into evidence and the case proceeded.

The second incident involved a photograph of defendant taken the night of his arrest. It was to be used in connection with the testimony of witnesses that defendant was clean-shaven. Defendant now argues that Mr. Osmundson took the picture from its envelope before showing it to the judge and that he walked in front of the jury with it, thus displaying it to the jury before it was offered in evidence. According to the record, Mr. Klein contended that he believed the jurors had been shown the picture, but the record also indicates that the picture was not shown to the jury at all but only handed over to be marked for identification.

The intentional or unintentional character of Mr. Osmundson's actions was for the trial court to decide. ■ Apparently the judge determined that the prosecutor had not acted intentionally and this court, after reviewing the transcript, has no means of determining otherwise. In any event, both pictures were later admitted in evidence, hence the prosecutor's action was harmless. ■ A court, of course, should not tolerate the tactic of an attorney who deliberately permits the jury to see an exhibit which is not in evidence.

■ Defendant charges additional misconduct of Deputy District Attorney Osmundson. In questioning an undercover narcotics agent relative to a date on which he had seen defendant, the prosecutor twice asked whether, at that time, the witness knew that another agent had already made a "buy" from defendant. On both occasions defense objections were sustained. On the first occasion, but not on the second, the court admonished the jury. Mr. Klein did not request that the questions be assigned as misconduct.

The statement which Mr. Osmundson sought to elicit was intrinsically prejudicial, addressed to an insignificant collateral topic, devoid of foundational inquiry to ascertain the witness's personal knowledge and thus inviting potential hearsay. ■ The deliberate asking of questions calling for inadmissible and prejudicial answers is misconduct. (Witkin, Cal. Criminal Procedure (1963) § 438.) If Mr. Osmundson knew what he was doing, he was guilty of tactics unbecoming to a public prosecutor. If he did not, his ignorance had no less potential for harm. ■ Fortunately for the orderly administration of justice—and fortunately for the public treasury which would be called upon to finance a retrial—the prosecutor's misconduct did not cause a miscarriage of justice. Other evidence estab-

lished the narcotics "buy" in question. Because there is no reasonable probability that it contributed to the verdict, the misconduct is not a ground for reversal. (Cal. Const., art. VI, § 13; *People* v. *Watson,* 46 Cal.2d 818, 831 [299 P.2d 243].)

## Claims of Judicial Misconduct

The record reveals an acriminious five-day trial in which the attorneys mistook bickering and side remarks for vigorous advocacy.[1] The prosecutor, as we have noted, was guilty of at least one act of misconduct. Mr. Klein in his turn cluttered and interrupted the trial with frivolous objections. He aroused the trial judge's justified ire by permitting a witness to remain in the courtroom despite an exclusion order. He was twice late in returning to the trial after a recess. On the afternoon of the third trial day he was 15 minutes late, apologized and explained that the judge of another court had detained him. Outside the jury's presence the trial court held him in contempt for tardiness and imposed a one-day suspended jail sentence.

On the second occasion when Mr. Klein accused Mr. Osmundson of permitting jurors to see photographs not yet in evidence, an off-record conference at the bench occurred. During this conference, as the trial judge later described it for the record, Mr. Klein accused Mr. Osmundson of indulging in crap and Mr. Osmundson sank to the occasion by voicing an epithet denoting the fecal matter of a male bovine. At that point the judge recessed the trial, rebuked the attorneys, indicated that he wanted to consider their behavior and put the matter over to the next morning.

The next morning, outside the jury's presence, the court found both attorneys in contempt. Mr. Osmundson apologized. Mr. Klein attempted to justify his language. In view of Mr. Osmundson's apology, the judge imposed on him a $50 fine. He imposed a 24-hour jail sentence on Mr. Klein, refused to stay execution and committed him to jail immediately.[2] In view of the jailing, defendant's trial was recessed until the following morning. The trial resumed the next morning after Mr. Klein's release from jail, and the case was submitted to the jury on the afternoon of the second day thereafter.

Defendant now contends that imposition of the one-day contempt sentence on his trial attorney in mid-trial constituted judicial misconduct.

 A trial court has inherent statutory power to exercise reasonable control over the trial in order to insure the orderly administration of

---

[1]Defendant is represented on appeal by counsel other than his trial attorney.

[2]In an unpublished opinion, this court on March 5, 1971, sustained the contempt adjudication against Mr. Klein. (*Klein* v. *Superior Court,* 3 Civ. 12972.)

justice and to maintain the dignity and authority of the court; it has power to punish summarily for contempts committed in its immediate view and presence. (Pen. Code, § 1044; Code Civ. Proc., §§ 1209, 1211; *Cooper* v. *Superior Court,* 55 Cal.2d 291, 301 [10 Cal.Rptr. 842, 359 P.2d 274]; *Mowrer* v. *Superior Court,* 3 Cal.App.3d 223, 230 [83 Cal.Rptr. 125].) As punishment for contempt a court may impose a fine not exceeding $500 or up to five days imprisonment or both. (Code Civ. Proc., § 1218.)

California case law does not echo the decisional statements of other states declaring that the kind, timing and extent of punishment are discretionary. (See 17 C.J.S., Contempt. § 92, fn. 92; § 98, fn. 55.) ▇▇ Nevertheless, it is evident that a California court has discretionary power within the statutory limit to fix, alter, remit, suspend or postpone the punishment. (See *In re Ciraolo,* 70 Cal.2d 389, 399 [74 Cal.Rptr. 865, 450 P.2d 241]; *Lyons* v. *Superior Court,* 43 Cal.2d 755, 763 [278 P.2d 681].) ▇▇ As a general proposition a reviewing court may not inquire into the reasonableness of a contempt punishment fixed by the trial court within the statutory maximum. (*City of Vernon* v. *Superior Court,* 39 Cal.2d 839, 842 [250 P.2d 241]; *City of Vernon* v. *Superior Court,* 38 Cal.2d 509, 520 [241 P.2d 243].) This appeal does not involve review of the punishment inflicted upon the attorney but rather assessment of its impact upon the defendant's right to a fair and speedy trial.

This is the first and only case coming to our attention in which a judge has seen fit to imprison an accused person's defense attorney in midtrial.[3] The parties have cited no case like it and additional research, although not exhaustive, has revealed none. Virtually uniform practice entails deferment of the contempt adjudication or of actual punishment until the jury is discharged. "It is now well established practice for the trial judge to reserve punishment of contempts by participants in a criminal trial." (*Yates* v. *United States,* 227 F.2d 851, 853 (revd. in part on other grounds, 355 U.S. 66 [2 L.Ed.2d 95, 78 S.Ct. 128].) Deferment until completion of the trial causes no loss of jurisdiction. (*Sacher* v. *United States,* 343 U.S. 1 [96 L.Ed. 717, 72 S.Ct. 451]; *Lamberson* v. *Superior Court,* 151 Cal. 458, 460 [91 P. 100]; *In re Grossman,* 109 Cal.App. 625, 632 [293 P. 683]; Note 100 A.L.R.2d 439; cf. *In re Foote,* 76 Cal. 543 [18 P. 678].)

When an accused's defense attorney indulges in offensive courtroom behavior, the court's obligation to protect the orderly administration of

---

[3]In *People* v. *Johnson,* 219 Cal. 72 [25 P.2d 408], the defense attorney's disrespectful behavior during the prosecution's closing argument prompted the judge to declare him in contempt and to direct the bailiff to take him in charge. Answering a charge of error, the Supreme Court observed: "Said counsel was not, however, removed from the courtroom and was permitted thereafter with his co-counsel to participate in the proceedings." (219 Cal. at p. 79.) Inferentially, the attorney's ability to conduct the defense of his client without interruption was a factor in the finding of lack of prejudice.

justice moves into tension with the accused's right to a fair, speedy and rational adjudication of guilt. Balancing and reconciliation are the obvious needs. The judge must weigh the need for orderly trial against the desiderata of fair trial. In several nationally notorious trials, offensive behavior by the attorneys dwarfed the relatively innocuous activity of the present attorney. Although the apparent targets of deliberate goading, the trial judges in those cases did not permit interruption of the trial, but deferred contempt proceedings until the trial was completed. (See, e.g., *Sacher* v. *United States, supra;* Niederhoffer and Smith, *Power and Personality in the Courtroom: The Trial of the Chicago 7,* 3 Conn.L.Rev. 233.) Here, on the morning of the fourth day of trial, the court jailed the attorney for 24 hours, forcing a 24-hour interruption of the trial. The brief contempt proceedings occupied the entire record for a single day. The record does not show that the jurors had been instructed not to report. Inferably they did report, earned their fees and were sent home.

 Code of Civil Procedure section 1211 permits summary punishment for contempt committed in the court's immediate presence. The term "summary" refers to the character of the contempt proceeding, not its timing, and does not demand instanter punishment. (*Sacher* v. *United States, supra,* 343 U.S. at p. 9 [96 L.Ed. at pp. 723-724]; *United States* v. *Galante,* 298 F.2d 72, 76 [100 A.L.R.2d 431]; *MacInnis* v. *United States,* 191 F.2d 157, 160-161; *In re Grossman, supra,* 109 Cal.App. at p. 632; see 1971 Wis.L.Rev. 329, 332.) Effective vindication rarely demands interruption of the criminal trial. Indeed, the federal Supreme Court has given cogent reasons for deferring punishment of contumacious counsel: "Reasons for permitting straightway exercise of summary power are not reasons for compelling or encouraging its immediate exercise. Forthwith judgment is not required by the text of the [federal] Rule. Still less is such construction appropriate as a safeguard against abuse of the power. If the conduct of these lawyers warranted immediate summary punishment on dozens of occasions, no possible prejudice to them can result from delaying it until the end of the trial if the circumstances permit such delay. The overriding consideration is the integrity and efficiency of the trial process . . . ." (*Sacher* v. *United States, supra,* 343 U.S. at pp. 9-10 [96 L.Ed. at pp. 723-724].)

 In a felony trial the absence of the accused's only trial attorney effectively halts the trial. (*Lyons* v. *Superior Court, supra,* 43 Cal.2d at p. 758.) The summary imprisonment of a defense attorney midway in a criminal trial has a large potential for harm. Court delays are a hardship on the litigants and create problems for all parties concerned with the administration of justice. (*Mowrer* v. *Superior Court, supra,* 3 Cal.App.3d at p. 232.) The trial court's statutory duty is to control the trial and ancillary proceedings "with a view to the expeditious and effective ascertainment

of the truth . . . ." (Pen. Code, § 1044.) ▮ Unless demanded by overwhelming circumstances, the court-imposed delay caused by jailing the defense lawyer in midtrial is inherently wrong, damaging to the defendant's right to a speedy trial and antithetical to the public interest in speedy, economical justice. Trial attorneys frequently use recesses and evenings for preparatory and investigative work. The jailing of an attorney in midtrial puts a quietus on that work. The jailing may come to the ears of the jurors and cause an adverse reaction.[4] Finally, the timing of the action injects into the trial an irrelevant source of potential causalities which may, in some unforeseen way, alter its course or shape its result.

A recent study of trial court disruption suggests immediate assertion of the judge's contempt power without awaiting the conclusion of the proceedings, arguing that later trial of the contempt impairs the judge's ability to increase the pressures by augmenting the severity of successive punishments.[5] The suggestion gives inadequate weight to the overriding importance of the pending trial. It overlooks the unpredictable emanations aroused by midtrial punishment of the attorney. During an extended trial a judge may exert adequate pressure on contumacious counsel by imposing successive contempt sanctions but suspending execution of punishment until the verdict is in. Another recommendatory body suggests that the trial judge give the attorney prompt notice of intention to hold him in contempt but defer the actual proceeding unless prompt punishment is imperative.[6]

In this case the trial court found Mr. Klein in contempt for tardiness which delayed the trial for 15 minutes, then itself forced a 24-hour delay by the 24-hour jail commitment. Conceivably, a case could arise in which extraordinary circumstances justify the jailing of an attorney in midtrial. Hence, an unqualified rule flatly condemning that action would be inappropriate. ▮ Rather, the immediacy or deferment of contempt punishment is discretionary. " ' "In a legal sense discretion is abused whenever in the exercise of its discretion the court exceeds the bounds of reason, all of the circumstances before it being considered." ' " (*People* v. *Russel,* 69 Cal.2d 187, 194 [70 Cal.Rptr. 210, 443 P.2d 794].) ▮ In exercising its discretion the court should bear in mind that direct contempt " 'is necessarily of an arbitrary nature, and should be used with great prudence and caution.' " (*Lyons* v. *Superior Court, supra,* 43 Cal.2d at p. 762.) The

---

[4]The federal Supreme Court has expressed the fear that jury knowledge of the contempt will arouse prejudice. (*Sacher* v. *United States, supra,* 343 U.S. at p. 10 [96 L.Ed. at p. 724].) California cases assume lack of prejudicial impact upon the jury. (*People* v. *Johnson, supra,* 219 Cal. at p. 79; *People* v. *Gregory,* 12 Cal.App. 2d 7, 15 [54 P.2d 770]; see Note 29 A.L.R.3d 1399.)

[5]American College of Trial Lawyers, Report and Recommendation on Disruption of the Judicial Process (1970) pp. 12-13.

[6]American Bar Association Project on Standards for Criminal Justice, The Judge's Role in Dealing with Trial Disruptions (Advance Report) pp. 19-20.

People have pointed to no justification whatever for the jailing of defendant's attorney in midtrial and the consequent suspension of the trial. ■ All considerations of policy and fairness impelled deferment and no discernible need called for immediate jailing; hence, the court's action was an abuse of discretion vis-a-vis the defendant on trial.

Although defendant charges that Mr. Klein's trial conduct after his jail sojourn was less "spirited" than before, he fails to show that the court's erroneous action had a palpably adverse impact upon the defense. He fails to depict inadequacy of Mr. Klein's advocacy as a "demonstrable reality." (Cf. *People* v. *Reeves,* 64 Cal.2d 766, 774 [51 Cal.Rptr. 691, 415 P.2d 35].) During the remaining two days of trial the defense examined five witnesses of its own, cross-examined seven rebuttal witnesses called by the prosecution, called three witnesses on surrebuttal and argued evidentiary points to the court. No request has been made to add Mr. Klein's jury summation to the appeal record; inferably, then, his jury argument was unaffected by his jail sojourn. We find no reasonable probability of an acquittal absent the error; thus the error furnishes no ground for reversal. (*People* v. *Watson, supra,* 46 Cal.2d at p. 831; see also, *People* v. *Cole,* 113 Cal.App.2d 253, 261 [248 P.2d 141].)

■ Defendant also charges that the court repeatedly addressed disparaging remarks to Mr. Klein in the jury's presence, thus arousing jury prejudice. He declares but fails to convince that these remarks had an influence upon the trial's outcome. No prejudicial error occurred at these points of the trial.

### Sufficiency of Evidence

There is no merit in defendant's claim of inadequate evidence to support the charge of amphetamine possession for sale and of heroin possession on November 19. ■ To prove unlawful possession of narcotics the evidence must show that the accused exercised dominion and control over the drug with knowledge of its presence and of its narcotic character. (*People* v. *Hutchinson,* 71 Cal.2d 342, 345 [78 Cal.Rptr. 196, 455 P.2d 132].) ■ Exclusive possession of the premises where the drug is found is not required, nor is physical possession of the drug. (*People* v. *Roberts,* 228 Cal.App.2d 722, 727 [39 Cal.Rptr. 843].) ■■ Possession need not be exclusive; while mere access to the place where the contraband is found is not enough, the fact that other persons had access does not negative a finding of joint possession and control. (*Ibid.* pp. 726-727.) ■ Knowledge of the drug's presence and narcotic character may be proved circumstantially. (*Ibid.* p. 726.) ■ The intent to sell may be found by reasonable inference drawn from circumstantial evidence. (See, e.g., *People* v. *Kortopates,* 264 Cal.App.2d 176, 179-180 [70 Cal.

Rptr. 189]; *People* v. *Fitzwater,* 260 Cal.App.2d 478, 489-490 [67 Cal. Rptr. 190].)

At this point defendant is really arguing the effect of his absence from his garage at the time the police entered it and the fact that the other persons there may have had access to the narcotics cache in the file cabinet in his garage office. ██ ██ The location of the contraband in the file cabinet; defendant's prior sales of amphetamine from the cabinet; his redeposit of unsold amphetamine in the cabinet; his declaration (heard by Detective Fowler) that he could supply a pound of methedrine per week; the heavy quantity of amphetamine found in the cabinet—all these circumstances permitted the reasonable inference that he exercised exclusive or joint custody and control over the drug, was aware of its character and intended to sell it. A reasonable inference of knowing heroin possession could be drawn from the same circumstances, plus the presence of injection paraphernalia, plus the needle marks on his arm.

Defendant's claim that the conviction of amphetamine sale on November 13 is without adequate evidentiary support is frivolous, being nothing more than an attack on the credibility of Diana Lauck, the police informer who testified to the sale.

### Jury Instructions

There is no substance to defendant's attack on CALJIC Instructions 1.24, 12.00 and 12.20, which were included in the court's jury charge. These instructions correctly declared the legal requisites of the possession counts in the information and were fully justified by the evidence. At this point, too, defendant is arguing that his absence from the garage on November 19 and the presence of others effectively transferred possession and control away from himself. As we have pointed out, it was not necessary that the evidence show defendant's exclusive or physical possession, but only that the contraband was in a place under his possession and control. The instructions did not foreclose the jury from finding that persons other than defendant had possession and control at the time in question.

██ Defendant correctly charges that the court erred in giving the jury the substance of CALJIC 2.06.[7] The Attorney General attempts to support this instruction by Diana Lauck's testimony that she had been "scared" to testify at defendant's preliminary examination because, as she claimed, she had been stabbed by Gary Motheral, an associate of defendant's. The

---

[7]At this point the court instructed the jury: "Evidence that a defendant attempted to suppress evidence against himself in any manner, such as by intimidation of a witness may be considered by you as a circumstance tending to show a consciousness of guilt. You may not consider this as tending to show defendant's consciousness of guilt unless you find that defendant authorized those efforts."

attempt at justification fails. Diana Lauck testified fully at defendant's trial. There was no evidence that defendant or any confederate had attempted to stifle her trial testimony. Even as to her asserted reluctance to testify at the preliminary examination, there was no showing that defendant had anything to do with the stabbing.

The error was harmless for two reasons: First, the last sentence of the instruction, as modified by the court, directed the jury to disregard any suppression effort unless defendant authorized it; there was no evidence that he had. Second, the evidence of defendant's consciousness of guilt was heavy and compelling, eliminating any reasonable probability that the jury was influenced by the instruction. (*People* v. *Watson, supra,* 46 Cal.2d at p. 831.)

 In addition to the standard instruction on proof beyond a reasonable doubt (CALJIC 2.90), the court gave former CALJIC 22 (Revised).[8] Defendant assails the latter instruction as error, pointing out that it has been eliminated from the latest (1970) edition of CALJIC. To give the latter instruction in conjunction with the former may be unnecessary; it is not error. (*People* v. *Benjamin,* 3 Cal.App.3d 687, 698 [83 Cal.Rptr. 764], and cases cited.)

### Attack on Sentence

Defendant charges that the court violated prohibitions against multiple punishment by imposing separate consecutive prison sentences on the four charges of which he was convicted.

 Penal Code section 654 prohibits multiple punishments for a single act which violates different penal statutes. The act of possession cannot be conceptualized as a single "act" covering possession of two kinds of illicit drugs. Thus defendant may be separately punished for the criminal act of possessing amphetamine for sale and for the separate criminal act of possessing heroin, although both acts occurred simultaneously and both drugs were found at the same place. (*People* v. *Lockwood,* 253 Cal.App.2d 75, 82 [61 Cal.Rptr. 131]; see also, *In re Hayes,* 70 Cal. 2d 604, 606 [75 Cal.Rptr. 790, 451 P.2d 430].)

 The sales of amphetamine on October 30 and November 13 did not form an indivisible course of criminal conduct aimed at a single objective. (*Neal* v. *State of California,* 55 Cal.2d 11, 19 [9 Cal.Rptr. 607,

---

[8]In the latter instruction, the court told the jury: "The law does not require demonstration or that degree of proof which, excluding all possibility of error, produces absolute certainty, for such degree of proof is rarely possible. Moral certainty only is required, which is that degree of proof which produces conviction in an unprejudiced mind."

357 P.2d 839].) They were separate criminal acts, each with its own objective of sale to a different individual. Separate sentences for these two offenses did not violate the prohibition against multiple punishment. (Cf. *In re Johnson,* 65 Cal.2d 393, 395 [54 Cal.Rptr. 873, 420 P.2d 393].) Nor, under the circumstances, was the possession of amphetamine a mere incident to the two sales. ■ According to *People* v. *Sheldon,* 254 Cal.App.2d 174, 183 [61 Cal.Rptr. 778], separate punishments for sale and possession may not be imposed where the sale consists of the peddler's entire inventory. Where, as here, each sale consumes only part of his inventory, he may be punished separately for the possession of his unsold stock in trade. (*People* v. *Fortier,* 10 Cal.App.3d 760, 765-766 [89 Cal. Rptr. 210]; *People* v. *Allen,* 254 Cal.App.2d 597, 604 [62 Cal.Rptr. 235].)

Although his argument is not entirely clear, defendant makes a further attack on the imposition of consecutive rather than concurrent sentences. No prior conviction was charged or found. ■ A trial court has discretion to determine whether separate sentences for separate offenses are to run concurrently or consecutively. (Pen. Code, § 669; *In re Sandel,* 64 Cal.2d 412, 416 [50 Cal.Rptr. 462, 412 P.2d 806].) ■ As pointed out earlier in this opinion, discretion is abused only when the action exceeds the bounds of reason, all the circumstances being considered. (*People* v. *Russel, supra,* 69 Cal.2d at p. 194.) A comprehensive roundup of the "abuse of discretion" decisions in various areas of California law would doubtless reveal fluctuating degrees of appellate laissez-faire. In none is appellate review more circumscribed than in sentencing.[9] ■ The Legislature has by statute fixed the outer limits of reasonableness in sentencing. It permits appellate modification of sentence only in limited situations, of which this is not one. (See Pen. Code, §§ 1181, subd. 7; 1260; *People* v. *Odle,* 37 Cal.2d 52, 57-58 [230 P.2d 345].) Aside from those situations, a reviewing court cannot say that a period of imprisonment within the limits fixed by statute exceeds the bounds of reason.

Judgment affirmed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied August 12, 1971, and appellant's petition for a hearing by the Supreme Court was denied October 21, 1971. Peters, J., and Sullivan, J., were of the opinion that the petition should be granted.

---

[9] See *People* v. *Beasley,* 5 Cal.App.3d 617 [85 Cal.Rptr. 501]; Weigel, *Appellate Revision of Sentences: To Make the Punishment Fit the Crime* (1968) 20 Stan.L.Rev. 405. A number of factors, including appellate noninterference, have created large swings of subjectivity and wide disparities in California felony sentences. The writer of this opinion has expressed sentencing judges' "acute need . . . to be rescued from subjectivity." (Friedman, *The Dilemmas of Sentencing,* 1969 Sentencing Institute for Superior Court Judges, 85 Cal.Rptr., Appendix, pp. 13, 20; 44 State Bar J. 372, 378.)