Filed 1/4/21  P. v. Ballard CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Calaveras)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>WILLIAM BRANDON BALLARD,<br><br>    Defendant and Appellant. | C086079<br><br>(Super. Ct. No. 17F7115) |

Defendant William Brandon Ballard appeals from his conviction of assault with intent to commit rape.  He contends that prejudicial error occurred at trial because (1) the trial court did not instruct sua sponte on the purported lesser included offense of attempted sexual battery; (2) his attorney rendered ineffective assistance by not requesting bracketed cautionary language related to the instructions on the jury's consideration of defendant's oral statements and by not requesting an instruction on voluntary intoxication; (3) the trial court instructed the jury with CALCRIM No. 1190

1

without also including in that instruction directions on the prosecution's burden of proof; (4) the trial court abused its discretion by denying his motion for a mistrial based on prosecutorial misconduct; and (5) the errors were cumulatively prejudicial.

We affirm the judgment.

## FACTS AND PROCEDURAL HISTORY

Antoinette and Robert Tapia own a saloon in the Calaveras County town of Avery. The saloon is a community bar, but customers must behave or they are asked to leave. Customers are not allowed behind the bar. The Tapias keep a stun gun behind the bar for security.

Veronica C. worked as a bartender at the saloon. She usually worked alone during her shifts. Veronica worked the closing shift alone on May 5-6, 2017.

Defendant was a customer at the bar. He usually came in on Friday nights after 10:00 p.m. and he usually drank Coors. Almost every time defendant came to the bar, he would tell Veronica how pretty he thought she was and would flirt with Veronica to the point it made her uncomfortable. Veronica did not ever flirt back with him.

May 5, 2017, was Cinco de Mayo and a busy night at the bar. Defendant, wearing a baseball cap, came into the bar around 1:00 a.m. the morning of May 6. There were still patrons at the bar when he arrived. At one point, Veronica asked defendant to dump empty bottles for her, and she gave him a complimentary beer in return.

By 1:30 a.m., defendant and Veronica were the only people in the bar which was dimly lit. Defendant sat at the bar drinking beer while Veronica cleaned up and they engaged in small talk. Defendant had two additional beers that evening. He paid for the two beers with a credit card. Veronica ran his credit card at 1:51 a.m. after which defendant signed the receipt and went to the bathroom. Veronica started to close out the register. She faced the wall at the register, and her back was to the rest of the bar.

2

About a minute and a half after Veronica started closing the register, defendant came behind the bar. Veronica told him she was closing and it was time for him to go home. Defendant moved closer to her and asked if he was making her uncomfortable. She said yes and told him to go home. He started to take her jacket off her shoulder slowly and in an intimate manner. She shrugged him off immediately and told him to go home.

Defendant again asked Veronica if he was making her uncomfortable. She responded, "[Y]es, you are making me uncomfortable." Defendant grabbed the front of her shirt and her bra and tried to pull them down. Veronica heard her bra rip a little but her top stayed on. She shoved defendant in his chest. He grabbed both of her wrists violently with his hands. She could not move. He tried to kiss her, but she turned her head and his kiss landed on her neck. Defendant said, "This is what I'm going to have to do to fuck you." Veronica said something like, "this isn't happening."

Defendant grabbed her by the front of her neck with an open palm and applied pressure. She was trapped in a corner behind the bar with her back to the wall. He did not strangle her, but she could not move. After holding Veronica like this for about 20 seconds, defendant turned her around and pushed her face-forward against the bar. He tried to pull down her shorts, but her shorts were cinched tight around her waist and he could not get them down.

Veronica pushed defendant away and pulled the stun gun out from the outlet behind the bar. Defendant walked toward her while she tried to activate the gun, but she could not figure what to do with it. Still holding the gun, she tried pushing him back. He grabbed her wrists and tried to jerk her around. During the struggle, she accidentally activated the stun gun and shocked herself. She dropped the gun. Defendant laughed at her and said, "[T]hat's what you get."

Veronica picked up the gun and shocked defendant in his neck. By now, she thought he was going to rape her. The shock had little effect on him except to make him

3

madder. He grabbed her and pushed her up against the wall. He held her arms above her head against the wall. She spit in his face. He said, "I didn't know you were a dirty whore" and that he liked it. She kneed him in his groin—twice. He released her arms a bit, she pushed him back, and he fell into the bar.

Veronica grabbed the telephone from the bar and threatened to call 911 if defendant did not leave. She told him she never wanted to see him again. Defendant got up and said, "[W]hat are you talking about? I didn't touch you." He called her a "crazy bitch" who was out of control and said, "I didn't do anything you didn't want me to do." Veronica said she would tell the owners what happened, and he told her to "go ahead. I'll tell them my side of the story. We'll see who they believe." Veronica started dialing the phone, but then she thought about how it was his word against hers. He was immediately denying anything had happened, and the situation had "been flipped onto me now." She told him to leave and never come back. Defendant slowly left the bar, and Veronica locked the door behind him.

Veronica finished closing the bar, but she did not do a thorough job. She could not focus on her tasks and she stayed at the bar for about 15 to 20 minutes. Before she left, she looked to see if defendant was on the outside deck or near her car, but she did not see him. Veronica had seen her "fair share" of intoxicated people, and defendant did not appear to be drunk to her that evening. She had seen him drunk before, and he was not at all acting like he was drunk.

Asked why she did not call 911, Veronica stated that when the assault was happening, she knew help would not be there for at least 15 minutes, so she had to fight. Afterward, defendant had made her to be the villain, and once police were called to a bar, police would be everywhere. She didn't want "static" for the bar. She thought that since she was not raped, "this will just go away" and she would not have to see defendant again.

When Antoinette Tapia entered the bar on the morning of May 6, 2017, she found a men's hat at the entrance to the women's restroom and thought that was strange. After finding the hat, she received a phone call from Veronica and Veronica told her what happened. At trial, Antoinette identified a credit card receipt in defendant's name that was timestamped at 1:51 a.m. on May 6.

When Robert Tapia arrived that morning, the stun gun was on the floor of the bar. One of its prongs that would plug into an electric socket for charging was broken off inside the socket.

Veronica arrived at the bar at around 5:00 p.m. that day to talk to the owners in person. After she spoke with them, the owners decided to call 911 to report the assault. Veronica spoke with the sheriff and his deputy that day.

Criminalists examined the hat—a baseball cap—and the stun gun's stun prongs for DNA evidence. DNA found on both items was consistent with defendant's DNA.

The jury found defendant guilty of assault with intent to commit rape. (Pen. Code, § 220, statutory section references that follow are to the Penal Code unless stated otherwise.) The trial court sentenced defendant to the middle term of four years in state prison.

DISCUSSION

I

*Instructions on a Lesser Included Offense*

Defendant contends the trial court erred by not, on its own initiative, instructing on attempted sexual battery as a lesser included offense of assault with intent to commit rape. Defendant acknowledges that in *People v. Dixon* (1999) 75 Cal.App.4th 935 (*Dixon*), a panel of this court concluded that attempted sexual battery is not a lesser included offense of assault with intent to commit rape. (*Id.* at p. 937.) Defendant, however, asserts that *Dixon* was wrongly decided. He raises many of the arguments the

5

*Dixon* court rejected in reaching its decision. We conclude the trial court did not err by not instructing on attempted sexual battery as a lesser included offense.

Generally, a trial court must instruct sua sponte on a lesser offense necessarily included in the charged offense if the lesser offense is supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 154.) To determine if an offense is a lesser included offense for this purpose, courts apply one of two tests. Defendant pursues his argument under the so-called "elements test." " 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404, quoting *People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.)

Section 220 declares that any person who assaults another with the intent to commit rape is guilty of a felony, here the purported greater offense. (§ 220, subd. (a).) "[A]n assault with intent to commit rape is merely an aggravated form of an attempted rape, the latter differing from the former only in that an assault need not be shown." (*People v. Rupp* (1953) 41 Cal.2d 371, 382.) " 'The essential element of [assault with intent to commit rape] is the intent to commit the act against the will of the complainant. The offense is complete if at any moment during the assault the accused intends to use whatever force may be required.' (*People v. Meichtry* (1951) 37 Cal.2d 385, 388-389.)" (*People v. Davis* (1995) 10 Cal.4th 463, 509.) The crime "requires an intent to and an unlawful attempt to have sexual intercourse by force, violence or fear of bodily injury, without consent of the victim. [Citations.] The only intent required for the crime of rape itself is the intent to do the proscribed act. [Citations.]" (*Dixon, supra*, 75 Cal.App.4th at pp. 942-943.)

By contrast, section 243.4 sets forth the elements of sexual battery, the purported lesser offense. Under that statute, a person commits sexual battery when he "touches an intimate part of another person while that person is unlawfully restrained by the accused or an accomplice, and if the touching is against the will of the person touched and is for

6

the purpose of sexual arousal, sexual gratification, or sexual abuse[.]" (§ 243.4, subd. (a).) Sexual battery does not include rape. (§ 243.4, subd. (g)(2).)

An attempt to commit sexual battery pursuant to section 243.4, subdivision (a) "requires (1) an intent to and (2) a direct but ineffectual act in an attempt to, touch an intimate part of the body (contact with the victim's skin) of a victim unlawfully restrained (by force or fear), without the victim's consent, *for the purpose of sexual arousal, sexual gratification, or sexual abuse*. [Citations.]" (*Dixon*, *supra*, 75 Cal.App.4th at p. 942, original italics.)

The elements of attempted sexual battery and assault with the intent to commit rape are not identical. Assault with the intent to commit rape requires an intent and an attempt to commit nonconsensual sexual intercourse by force, violence, or fear of bodily injury. Attempted sexual battery requires an intent and an attempt to touch (other than by rape) an intimate part of the victim's body while the victim is unlawfully restrained and without the victim's consent for the purpose of sexual arousal, sexual gratification, or sexual abuse. The former crime does not require a showing of intent or purpose beyond an intent to commit sexual intercourse.

*Dixon* relied upon the differences between the two crimes to conclude that attempted sexual battery was not a lesser included offense of assault to commit rape. In *Dixon*, the trial court after a bench trial convicted the defendant of attempted sexual battery, assault with intent to rape, and misdemeanor false imprisonment of a single victim. (*Dixon*, *supra*, 75 Cal.App.4th at p. 940.) On appeal, the defendant claimed his conviction of attempted sexual battery had to be reversed because the crime was a necessarily included offense of assault with intent to rape. (*Ibid.*)

This court disagreed. We concluded that "assault with intent to commit forcible rape may be committed without necessarily committing attempted sexual battery, because the latter requires a finding that the defendant had the purpose of 'sexual arousal, sexual gratification, or sexual abuse,' where the former does not require any such finding."

7

(*Dixon*, *supra*, 75 Cal.App.4th at p. 943.) We stated that "an assault with intent to commit rape may be committed without a finding that the defendant harbored the purpose required by the sexual battery statute" and that "[a] finding that the defendant has the purpose to abuse the victim is not required for the crime of assault with intent to commit rape." (*Ibid.*) We reasoned, "While the law may view nonconsensual sexual intercourse as sexual abuse (which we shall assume in defendant's favor), the crime of assault with intent to commit forcible rape does not require a finding that the defendant had this purpose." (*Ibid.*)

Defendant argues that *Dixon*'s analysis is flawed. He claims it is nonsensical to assert that rape can be attempted for a purpose other than sexual abuse. Rape is "an act of sexual intercourse," the essential guilt of which "consists in the outrage to the person and feelings of the victim of the rape." (§§ 261, 263.) Defendant asserts that when one intends to, and attempts to, commit nonconsensual sexual intercourse by force, he is by definition and at a minimum attempting to touch an intimate part of the victim's body for the purpose of sexual abuse. Thus, defendant concludes, a person cannot commit an assault with the intent to commit rape without also committing attempted sexual battery.

Defendant misses the point. Under the elements test, the test for determining whether a crime is a lesser included offense of a greater crime is whether the *elements* are the same. " 'The elements test is satisfied if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, " '[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " ' ([*People v.*] *Bailey* [(2012)] 54 Cal.4th [740,] 748.)" (*People v. Robinson* (2016) 63 Cal.4th 200, 207, fn. omitted.)

The elements of the crime of attempted sexual battery are not also elements of the crime of assault with the intent to commit rape. To prove attempted sexual battery, the prosecution must establish not only that the defendant intended to touch the victim

8

unlawfully, but also *why* the defendant intended to touch the victim unlawfully.  The prosecution must show the defendant intended to touch the victim for sexual arousal, sexual gratification, or sexual abuse.  In contrast, when the prosecution charges a defendant with assault to commit rape, it does not need to establish why the defendant intended to rape the victim.  It needs to establish only that the defendant intended to have sexual intercourse.

Defendant assumes that any sexual crime is motivated by purposes of sexual arousal, sexual gratification, or sexual abuse, however the latter term is defined.  But whether that is true is irrelevant to showing a defendant assaulted the victim with the intent to commit rape.  The prosecution need not introduce evidence of the purpose behind the defendant's intent.  It can thus prove assault to commit rape without also necessarily proving attempted sexual battery.

Defendant nonetheless contends that interpreting attempted sexual battery to be a lesser included offense of assault to commit rape is not inconsistent with legislative intent.  For this point, defendant cites *People v. Alford* (1991) 235 Cal.App.3d 799 (*Alford*), as did the defendant in *Dixon*, where the court of appeal explained the legislative intent behind section 243.4, the sexual battery statute.  The *Alford* court stated, "Prior to enactment of section 243.4, sexually abusive conduct could only be prosecuted as a felony if the assailant assaulted the person with the specific intent to commit rape, sodomy, oral copulation, or any violation of section 264.1 (rape in concert with another), 288 (lascivious acts upon a child) or 289 (penetration of genitals or anus with foreign object).  ([Former] § 220 [Stats. 1979, ch. 944, p. 3253, § 3].)  Absent one of the specific intents, the crime was either misdemeanor assault or misdemeanor battery.  (§ 241 & 243.)  The purpose of [section 243.4] was to provide appropriate punishment for sexually abusive conduct which falls short of a violation of section 220 but which is nonetheless 'physically traumatic and psychologically terrifying.'  (Sen. Republican Caucus Bill Dig., Assem. Bill No. 2721 (Aug. 12, 1982).)  Accordingly, the statute allows for felony

9

prosecution when a touching occurs while the person is unlawfully restrained and against the person's will and is committed for a sexual purpose." (*Alford, supra*, 235 Cal.App.3d at p. 803.)

Relying on this quote, defendant claims the Legislature not only did not declare that sexual battery or attempted sexual battery could not be a lesser included offense of assault to commit rape, but that the Legislature intended to make the former a lesser included offense of the latter. Whether the Legislature did not declare that attempted sexual battery could not be a lesser included offense of assault to commit rape is not a test for determining the existence of lesser included offenses. And if the Legislature had intended attempted sexual battery to be a lesser included offense, it would not have imposed an additional element of proof for that crime which does not apply to assault to commit rape. The express language of the sexual battery statute defeats defendant's argument on legislative intent.

*Dixon* remains good law. The trial court did not err when it did not instruct on attempted sexual battery on its own initiative, as that offense is not a lesser included offense of assault to commit rape, the offense charged against defendant.

II

*Ineffective Assistance of Counsel*

Defendant contends his trial attorney twice rendered ineffective assistance: by not requesting bracketed cautionary language related to the instructions on the jury's consideration of defendant's oral statements, and by not requesting an instruction on voluntary intoxication.

Defendant has not shown ineffective assistance under either theory.

A.  *Request for cautionary language*

The trial court instructed the jury with CALCRIM No. 358 regarding defendant's extrajudicial statements. The instruction states: "You have heard evidence that the

10

defendant made oral statements.  You must decide whether the defendant made any of these statements, in whole or in part.  If you decide that the defendant made such statements, consider the statements, along with all the other evidence, in reaching your verdict.  It is up to you to decide how much importance to give to the statements."

CALCRIM No. 358 contains bracketed language which the trial court did not read to the jury.  The bracketed language states:  "Consider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded."

In *People v. Diaz* (2015) 60 Cal.4th 1176, the California Supreme Court held that this cautionary language need be given only upon request.  Although courts were previously required to give the language on their own initiative, the Supreme Court eliminated that requirement "because courts are now required to instruct the jury, in all criminal cases, concerning the general principles that apply to their consideration of witness testimony."  (*Id*. at p. 1190.)  The bracketed language was "not 'vital to the jury's ability to analyze the evidence.' "  (*Id*. at p. 1192, quoting *People v. Najera* (2008) 43 Cal.4th 1132, 1139.)

Defendant contends his trial counsel rendered ineffective assistance by not requesting that the court give the bracketed language to the jury.  Veronica testified that after defendant grabbed the front of her shirt and her bra, she pushed him away on his chest.  He grabbed both of her wrists and tried to kiss her.  When she turned her head so that he ended up kissing her neck, he said, "This is what I'm going to have to do to fuck you."  Because this statement was essential to the prosecution's case, defendant claims it was incumbent on his attorney to undercut Veronica's credibility as to the statement any way possible.  He argues that not requesting the bracketed language was not reasonable under prevailing professional norms, there is no satisfactory explanation for counsel's omission, and the omission was prejudicial.

11

To establish ineffective assistance, defendant must show (1) his attorney's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant, i.e., there was a reasonable probability that defendant would have received a more favorable result absent counsel's deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 691-694 [80 L.Ed.2d 674]; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.)

If the record on appeal " ' "sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' (*People v. Wilson* (1992) 3 Cal.4th 926, 936, quoting *People v. Pope* (1979) 23 Cal.3d 412, 426.) A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. (*People v. Wilson*, *supra*, at p. 936; *People v. Pope*, *supra*, at p. 426.)" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

Defendant has not established that counsel rendered ineffective assistance by not requesting the court to give the bracketed language to the jury. The record does not show why counsel did not request the court to read the bracketed language, and reasonable explanations satisfactorily explain counsel's tactical decision. As the Attorney General argues, counsel may have reasonably decided that additional instructions on the consideration of defendant's statement could highlight the statement for the jury to defendant's detriment. Indeed, counsel did not discuss the statement during closing argument. Not highlighting problematic evidence or argument is a reasonable tactic by defense counsel. (See, e.g., *People v. Huggins* (2006) 38 Cal.4th 175, 252-253; *People v. Wharton* (1991) 53 Cal.3d 522, 567.)

Even if counsel's decision not to request the court to read the bracketed language to the jury did not meet prevailing professional norms, a point we do not accept, defendant was not prejudiced by the omission. His uncontradicted statement would have

12

still come into evidence, and the jury was fully instructed on the principles of law that governed its consideration of witness testimony. The court instructed the jurors that when considering witness statements, they were to "consider, among other things, how well a witness could 'see, hear, or otherwise perceive the things about which the witness testified,' how well the witness was 'able to remember and describe what happened,' and whether the witness's testimony was influenced by 'bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided.' (CALCRIM No. 226.) These general instructions, like the cautionary instruction, 'aid the jury in determining whether [the defendant's extrajudicial statement] was in fact made.' (*People v. Bemis* [(1949)] 33 Cal.2d [395,] 400.) Consequently, the erroneous omission of the cautionary instruction has frequently been held to be harmless error in light of such general instructions on witness credibility." (*People v. Diaz, supra*, 60 Cal.4th at p. 1191.)

The jury was thus sufficiently instructed on how it could consider defendant's statement, and there is no indication the jury did not follow the instructions. Because counsel's performance on this issue was reasonable and defendant suffered no prejudice from it, counsel did not render ineffective assistance.

B.      *Request for instruction on voluntary intoxication*

Defendant contends his trial counsel rendered ineffective assistance by not requesting the court to instruct the jury with CALCRIM No. 3426 on voluntary intoxication as a defense to assault with the intent to commit rape. He claims sufficient evidence supported giving the instruction. From when he arrived at the bar until 1:51 a.m. the morning of the attack, defendant drank three beers. Defendant also claims statements in his probation report indicate he was likely intoxicated, but the probation report was not evidence from which the court could determine whether to give an

13

instruction.  Defendant claims the instruction would have likely affected the verdict to his benefit.

We disagree.  There was insufficient evidence on which the court could have based the voluntary intoxication instruction.  Counsel was not ineffective for not requesting an instruction which the court would have denied.

"An instruction on the significance of voluntary intoxication is a 'pinpoint' instruction that the trial court is not required to give unless requested by the defendant." (*People v. Rundle* (2008) 43 Cal.4th 76, 145, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)  That a defendant may have been drinking before committing a crime does not establish intoxication or require the court to instruct the jury on voluntary intoxication.  (*People v. Turville* (1959) 51 Cal.2d 620, 633, disapproved on another ground in *People v. Morse* (1964) 60 Cal.2d 631, 648-649.)  A defendant is entitled to an instruction on voluntary intoxication "only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*People v. Williams* (1997) 16 Cal.4th 635, 677, quoting *People v. Horton* (1995) 11 Cal.4th 1068, 1119.)

There is no evidence in the record showing that defendant's consumption of three beers while at the bar affected his ability to formulate the intent to rape.  The evidence shows without contradiction that defendant intended to rape Veronica.  After drinking the beers, defendant came behind the bar, approached Veronica, and started to pull her jacket off her shoulder in a slow manner.  Veronica shrugged off defendant's hand and told him to go home.  He didn't.  He asked if he was making her uncomfortable, and upon Veronica saying he was, he still did not retreat.  Instead, he grabbed the front of Veronica's shirt and bra and tried to pull them down.  Veronica pushed him away, but still he pursued.  He grabbed her by the writs, tried to kiss her, and, failing that, said, "This is what I'm going to have to do to fuck you."

14

Veronica said "this" would not happen, but defendant's intent was set. He grabbed her by the neck, then turned her around and pushed her face-forward against the bar. He tried to pull her pants down but could not. Veronica pushed him away, but defendant grabbed her again when she could not get the stun gun to function. After dropping it and shocking herself, she regained it and shocked defendant in the neck. Still he pursued. He pushed her against a wall and held her arms above her head against the wall. He released her only after she twice kneed him in his groin.

Veronica grabbed the phone and threatened to call the police. Defendant taunted her and blamed her for the incident. Veronica said she would tell the owners, but defendant encouraged her to tell them and he would, too. When Veronica told defendant to leave and never come back, defendant complied.

Nothing in these facts indicates defendant's drinking of three beers affected his ability to form the intent to rape Veronica. On this evidence, any request by defense counsel for an instruction on voluntary intoxication would have been denied. Counsel's decision not to request the instruction thus was not unreasonable under prevailing professional norms, and defendant suffered no prejudice from it.

III

*CALCRIM No. 1190*

Defendant contends the trial court erred by instructing the jury with CALCRIM No. 1190 without also including in that instruction statements on the prosecution's burden of proof. Defendant's argument borders on the frivolous.

The trial court instructed the jury with CALCRIM Nos. 301 and 1190. No. 301 states: "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." No. 1190 states: "Conviction of a sexual assault crime may be based on the testimony of a complaining witness alone."

15

Defendant asserts it was error for the court not to include with No. 1190 "the constitutionally required condition that if the jury does base its conviction on the testimony of the complaining witness alone, that testimony must be sufficient for conviction [i.e., prove each of the elements] and the jury must believe that testimony beyond a reasonable doubt." He argues the court's "omission in the instructions was that the jury might have convicted based solely on the complaining witness's testimony, even though it did not believe that [witness's] testimony beyond a reasonable doubt."

Defendant ignores that the trial court fully instructed the jury on the reasonable doubt standard and the prosecution's burden of proof. In addition to giving CALCRIM Nos. 301 and 1190, the court gave the jury CALCRIM No. 220, which explained the reasonable doubt standard and the prosecution's burden of proof. The instruction states in relevant part: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must prove it beyond a reasonable doubt unless I specifically tell you otherwise.

"Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

"In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. *Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty*." (Italics added.)

In addition to giving the jury CALCRIM No. 220, the court, as part of giving CALCRIM Nos. 223 and 224, told the jury the prosecution had to prove each element of the offense beyond a reasonable doubt. No. 223 states in part: "You [the jury] must decide whether a fact in issue has been proved based on all the evidence." And No. 224

16

states that before the jury could rely on circumstantial evidence to prove a fact, "*you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt*." (Italics added.)

The court gave the instructions defendant claims it omitted. Taken together, the instructions informed the jury that if the evidence consisted of the testimony of only one witness, it had to acquit defendant unless that witness's testimony proved each element of the charged offenses and that defendant was guilty beyond a reasonable doubt. Surely defense counsel knows " ' "that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." ' [Citation.]" (*People v. Haskett* (1990) 52 Cal.3d 210, 235.)

It is difficult to believe why defendant asserts, as he does here, that the jury was not informed of the standard of proof in this case simply because No. 1190 omitted those points. There is no reasonable likelihood that defendant's jury, understanding all the instructions it received, believed it could convict defendant without finding the prosecution proved each element of the charged offenses beyond a reasonable doubt, including if the victim's testimony was the only evidence presented to it. The trial court did not err in giving No. 1190 in this matter.

IV

*Mistrial for Prosecutorial Misconduct*

Defendant contends the trial court abused its discretion when it denied his request for a mistrial due to prosecutorial misconduct. During her rebuttal argument, the prosecutor referred to comments a prospective juror had made during voir dire to support her assertion that no one could know why a sexual assault victim might not call police after an attack. We conclude the trial court did not abuse its discretion.

17

A.    *Background*

During voir dire, Mr. L., a prospective juror, revealed that his former wife and his current fiancé were victims of rape. Neither reported the attacks to the police. The juror's former wife kept the incident a secret until disclosing it years later in counseling. Asked if he knew why she did not report it, Mr. L. thought it was because drinking was involved and the perpetrator, whom both he and his wife knew, walked her to her car and took advantage of her where she had parked in a secluded area.

Mr. L.'s fiancé was raped while a teenager by a family relative or friend. She reported the attack to her mother but not to police. Her mother said, "we'll handle this" and to let it go.

The prosecutor asked the venire about their expectations of how a sexual assault victim would behave. As part of the questioning, the prosecutor asked, "[I]s there anyone here who believes that sexual assault victims immediately call 911? No? I think we know from Mr. L[.] that that's not the case."

During their opening statements, the prosecutor and defense counsel mentioned that Veronica did not call 911 after the attack. The prosecutor said Veronica did not call 911 because she was at that moment thinking she was okay and was not hurt. She told the bar owners the next day and they reported the crime. Defense counsel told the jury they would not hear about a 911 call from Veronica. The 911 call was not made until 6:00 p.m. the next day and was made by the bar owner.

During closing argument, defense counsel argued that, among other factors, Veronica's not contacting the police after the attack called her credibility into question. Counsel argued that after the assault, Veronica finished closing the bar and plugged the stun gun back in. She did not call the owners, and she did not call the police. Instead, she went outside past 2:00 a.m. and walked to her car not knowing where defendant was

18

at that point. Counsel stated, "It's a woman that's almost been raped according to her. Think about that."

On rebuttal, the prosecutor mentioned Mr. L.'s testimony on voir dire to rebut defense counsel's argument. The prosecutor stated, "Now we all know there is no way to behave as a sexual assault victim. You're going to behave the way you behave. The way you react is the way you react. And no one can judge another person on that until you have had that situation happen to you. We know very well, you know, from a fellow perspective juror, women don't call 911 all the time. They just don't." Defense counsel did not object to the statement at the time.

Once the jury left to deliberate, defense counsel moved for a mistrial with prejudice. Counsel pointed to two instances where he believed the prosecutor committed misconduct in her argument. The prosecutor had stated that she herself had not been a victim of sexual assault and thus could not know what an honest reaction would be to the crime. Second, and most egregious, the prosecutor had referenced Mr. L.'s voir dire testimony as evidence that how someone behaves after being sexually assaulted is unknown.

The prosecutor claimed her argument was not improper. She used her personal experience to help the jurors understand that there was no expectation of how a sexual assault victim would act until one has been a victim. She referred to Mr. L.'s testimony to address the common stereotype, raised by defense counsel in closing argument, that Veronica was not a sexual assault victim because she did not call 911.

While the court was considering the motion for mistrial, the jury reached a verdict. The court brought the jury back in and reread to them CALCRIM No. 104. As part of reading the instruction, the court stated, "You must decide what the facts are in this case. You must use only the evidence that is presented in the courtroom. Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence. [¶] . . . [¶] Nothing that the attorneys say is evidence. In

their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." After reading the instruction, the court told the jury to return to deliberating. If the reread instruction changed their minds, they were to keep deliberating. If it did not, they were to inform the bailiff.

After the jury left, defense counsel argued that rereading the instruction would not cure the misconduct and that mistrial should be granted. The court denied the motion for mistrial. At that moment, the bailiff returned and announced that the jury was satisfied with its verdict.

B.  *Analysis*

"[W]e review a ruling on a motion for mistrial for an abuse of discretion, and such a motion should be granted only when a party's chances of receiving a fair trial have been irreparably damaged. In turn, ' "[t]he applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant [requested] an assignment of misconduct and [also] requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' (*People v. Ochoa* [(1998)] 19 Cal.4th 353, 427.)" (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

20

Initially, we note that defendant did not object to the prosecutor's statement during her rebuttal. However, the Attorney General is not asserting forfeiture because defendant raised the issue immediately after argument ended.

We conclude the trial court did not abuse its discretion when it denied defendant's motion for mistrial based on prosecutorial misconduct. Defendant's chance of a fair trial was not irreparably damaged by the prosecutor's improper remarks. Her comments were not a pattern of conduct but were two short comments out of her entire argument. They did not cause prejudicial harm because defendant did not rely solely on Veronica's not calling 911 to impeach her credibility. Defendant also relied on Veronica's other actions immediately after the attack. After defendant left, Veronica closed the bar, plugged in the stun gun, did not call the owners, and walked outside to her car after 2:00 a.m. not knowing where the defendant was. Defendant argued that these actions, along with not calling 911, showed that Veronica did not act like someone who had just been sexually assaulted. The prosecutor's reference to Mr. L.'s testimony did not affect the other grounds defense counsel raised for not believing Veronica.

Moreover, the issue of Veronica's credibility based on her actions after the attack was squarely before the jury. Veronica testified that she started dialing 911 when she threatened to call the police, but then she thought it would be her word against his. Defendant had already denied doing anything improper, and he placed any blame on her. So, she told him to get out and never come back. Veronica admitted she did not call 911, and the jury could determine whether that fact attested to her credibility.

If there was a reasonable likelihood that the jury would use the prosecutor's remark to consider Mr. L.'s voir dire testimony as evidence, the court eliminated that risk by rereading CALCRIM No. 104 to the jury. The instruction told the jurors they had to decide the case solely on the evidence presented at trial by witnesses and admitted exhibits, and they were not to consider anything the attorneys said in their arguments as evidence. Thus, the jury knew and understood it could not consider Mr. L.'s remarks.

21

"Ordinarily, a curative instruction to disregard improper testimony is sufficient to protect a defendant from the injury of such testimony, and, ordinarily, we presume a jury is capable of following such an instruction." (*People v. Navarrete* (2010) 181 Cal.App.4th 828, 834.) With no evidence to the contrary, we assume the jury complied with CALCRIM No. 104. The court, therefore, did not abuse its discretion in denying the motion for mistrial.

V

*Cumulative Error*

Defendant contends that the individual trial errors, though perhaps not prejudicial by themselves, create prejudice due to their cumulative effect. Because we have in effect determined that the only error, the prosecutor's improper argument, was harmless, there can be no cumulative error.

DISPOSITION

The judgment is affirmed.

_____
HULL, Acting P. J.

We concur:


_____
ROBIE, J.


_____
MAURO, J.

22